[S. F. No. 11041.   In Bank.—September 11, 1924.]

R. C. McFARLAND et al., Petitioners, v. THE SUPERIOR COURT OF THE COUNTY OF MERCED et al., Respondents.

[1] CONTEMPT — DIVERSION OF WATER—VIOLATION OF JUDGMENT—ALLEGATIONS OF AFFIDAVIT OF CONTEMPT—EVIDENCE—CERTIORARI.—In a proceeding in *certiorari* to review an order of contempt for violation of a judgment giving a canal company the right to take and divert from a river a stated quantity of water and prohibiting certain parties from pumping, taking, or diverting any of the waters of the river until said canal company shall have received said stated quantity of water, regardless of the affirmative defenses and questions of fact raised by the contemners, if the affidavit of contempt was sufficient and there was sufficient evidence to support its allegations, the judgment of contempt must be affirmed and the petition for a writ of *certiorari* denied.

[2] ID.—EVIDENCE—FACT — CERTIORARI. — In the contempt proceeding, the question whether a slough, into which the water of the river in question flowed and out of which the contemners had pumped water, had an independent source of supply as great, or greater, than was pumped out, was a question of fact to be determined by the trial court, and in the face of the evidence its determination became final.

[3] ID.—VIOLATION OF JUDGMENT — DILIGENCE IMMATERIAL. — In view of subdivision 5 of section 1209 of the Code of Civil Procedure, which provides that disobedience of any lawful judgment, order, or process of a court is a contempt, diligence on the part of the contemners, who are the officers and attorney of an irrigation district, in stopping pumping operations which were being carried on, in violation of a judgment and injunction, is not material as to the fact of disobedience.

3.   See 5 Cal. Jur. 913; 6 R. C. L. 502.

[4] ID.—ATTORNEY GUILTY OF CONTEMPT — EVIDENCE. — The testimony given in such contempt proceeding as to the conduct of the attorney for the irrigation district in advising an officer of the district that the decree prohibiting the diversion of water was "no good" and that he, the officer, could have it set aside and that the district continued pumping on the advice of the attorney, is sufficient to support the judgment of contempt as to such attorney.

[5] INJUNCTION—CORPORATIONS — NOTICE. — An injunction restraining a corporation, its officers, agents, and employees is binding upon all persons acting for the corporation with full notice and knowledge of the injunction.

[6] CONTEMPT — NOTICE TO CONTEMNERS — SUFFICIENCY OF. — In such contempt proceeding it is immaterial whether the canal company or its coplaintiff in the original action culminating in the judgment disobeyed by the officers and attorney of the irrigation district gave notice to the latter to cease pumping, there being no provision requiring the parties to the original action to institute proceedings in contempt.

[7] ID. — SEPARATE PROCEEDING. — A contempt is a separate and distinct proceeding and is no part of the original case out of which it arises; and as a matter of practice the party most likely to institute proceedings would be the one beneficially interested in the judgment.

[8] ID. — SHOWING OF INJURY UNNECESSARY. — In such contempt proceeding it is not necessary in order to constitute a contempt to show injury, the sole test being whether the judgment has been violated.

[9] ID.—ALLEGATIONS OF CONTEMNERS—EVIDENCE. — In such contempt proceeding, the allegations of the contemners that conditions have changed since the granting of the judgment in question and an additional supply of water developed and that water to which they are entitled is being impounded in reservoirs by the canal company are unsupported by the evidence, and, furthermore, if any testimony had been offered in support of the allegations, it would be immaterial and irrelevant to the issue of contempt before the court. Moreover, the contemners would have recourse to an action at law to determine any relative rights that may have intervened subsequent to the granting of injunctive relief.

4.   See 5 Cal. Jur. 902; 6 R. C. L. 493.
5.   See 5 Cal. Jur. 894; 6 R. C. L. 497.
7.   See 5 Cal. Jur. 935.

(1) 11 **C. J.**, p. 205, sec. 364.   (2) 11 **C. J.**, p. 203, sec. 363.
(3) 13 **C. J.**, pp. 9, 11, sec. 12 (1926 Anno.).   (4) 13 **C. J.**, p. 77, sec. 112.   (5) 32 **C. J.**, p. 491, sec. 855.   (6) 13 **C. J.**, p. 60, sec. 82.
(7) 13 **C. J.**, pp. 56, 59, secs. 80, 82.   (8) 32 **C. J.**, pp. 505, 506, secs. 883, 884.   (9) 32 **C. J.**, p. 506, sec. 884 (1926 Anno.).

PROCEEDING in Certiorari to review an order of the Superior Court of Merced County of contempt for violation of a judgment. E. N. Rector, Judge. Order to show cause discharged; petition for writ denied.

The facts are stated in the opinion of the court.

Dennett & Zion for Petitioners.

T. P. Wittschen and Kenneth C. Gillis for Respondents.

LAWLOR, J.—This is an application for a writ of review of an order adjudging petitioners, who are, respectively, the officers and attorney of the Tranquility Irrigation District, guilty of contempt of court for the violation of a judgment of injunction issued by respondent court in a proceeding instituted therein and entitled "Miller & Lux Incorporated, a corporation, and the San Joaquin & Kings River Canal & Irrigation Company Incorporated, a corporation, v. J. G. James Company, a corporation, and the San Joaquin Valley Farm Lands Company, a corporation, No. 2006 of the files of said court."

On August 14, 1923, the affidavit of W. H. Trump, the secretary of the San Joaquin & Kings River Canal & Irrigation Company, a corporation, was filed in the superior court of the state of California, in and for the county of Merced. This affidavit alleged that on the eighth day of January, 1917, the above-entitled court made and entered its final judgment in an action in which Miller & Lux Incorporated, a corporation, and the San Joaquin & Kings River Canal & Irrigation Company Incorporated, a corporation, were plaintiffs and J. G. James Company and the San Joaquin Valley Farm Lands Company, a corporation, were defendants; that said judgment has ever since said day been and now is in full force and effect; that by said judgment the San Joaquin & Kings River Canal & Irrigation Company Incorporated, a corporation, was entitled to take and divert from the San Joaquin River thirteen hundred and sixty (1360) cubic feet of water flowing therein per second at the head of its main and outside canals situated in the county of Fresno near the confluence of the San Joaquin River and Fresno Slough, and that by said judgment the defendants

and all of the agents and attorneys thereof and all successors and assigns of the said defendants were forever enjoined, restrained, and strictly prohibited from pumping, taking, or diverting any of the waters of the San Joaquin River or any of the water of the San Joaquin River being or flowing in Fresno Slough from the channels of said river or slough until the said plaintiff, the San Joaquin & Kings River Canal & Irrigation Company, shall have received into the head of its canals thirteen hundred and sixty (1360) cubic feet of water; that the defendants, the J. G. James Company and San Joaquin Valley Farm Lands Company, a corporation, formed an irrigation district known as the Tranquility Irrigation District and conveyed to it all the canals, pumps, and works owned by them in the San Joaquin River or in Fresno Slough, and that the Tranquility Irrigation District is the successor and assignee of the defendants; that the officers of the Tranquility Irrigation District had notice of the entry and existence of this decree and the terms thereof; that on the ninth, tenth, and eleventh days of August, 1923, "there was less than thirteen hundred and sixty (1360) cubic feet of water flowing per second in the San Joaquin River and Fresno Slough to the heads of said plaintiff's canals," and that the Tranquility Irrigation District on those days knowingly and intentionally took and pumped a large quantity of water of the San Joaquin River then flowing in Fresno Slough, well knowing that the plaintiff was not receiving and could not receive into its canals the quantity of water so adjudged to it and well knowing that the taking of the said water prevented the said plaintiff from taking, diverting, and using the quantity of water adjudged to it as aforesaid.

Upon this affidavit the trial court issued an order to show cause and ordering the Tranquility Irrigation District and its officers and attorney to appear before the court on September 4, 1923, to show cause why they should not be adjudged guilty of contempt and punished accordingly.

On September 4, 1923, the said R. C. McFarland, the engineer and superintendent of the Tranquility Irrigation District, filed his affidavit stating that the Tranquility Irrigation District takes its water from the Kings River and from the Fresno Slough; that the water diverted from the Kings River during a portion of the season is diverted by gravity,

and during another portion of the season the water used by the district is pumped from the Fresno Slough; that during the last two or three years the district has modified the diverting system from the Kings River so that the amount of water coming into Fresno Slough has been materially increased; that at all times and at the present time there is coming into the Fresno Slough above the point where the district pumps large amounts of water from sources other than the San Joaquin River; that the level of underground water, or the water-table, has been raised so that at the present time the surface of the water in Fresno Slough is only 0.80 hundredths of a foot above the water level; that the pumping of the Tranquility Irrigation District does not affect the flow of the water at the head of the canal of the San Joaquin & Kings River Canal & Irrigation Company; that every indication is that the water which would be pumped by the Tranquility Irrigation District is water coming from sources other than the San Joaquin River, and that the supply of water has been increased and developed by the action of the Tranquility Irrigation District; that the said district, in response to the demands of the plaintiffs, ceased to pump on the fourteenth day of August, 1923, and is not now pumping; that large amounts of water are being diverted into canals higher up the river than the intake of the canal of the San Joaquin & Kings River Canal Company, and higher up than the pumping plant of the Tranquility Irrigation District, which said canals are owned and controlled by the plaintiffs; that the intake of the San Joaquin & Kings River Canal & Irrigation Company has been examined and that said canal is not taking all of the water flowing in the river, but a very considerable amount of water is flowing past said intake and on down the San Joaquin River, and that a large portion of the water diverted into said canal is being apparently wasted and turned out to flood grass land.

The answer of the said R. C. McFarland, W. A. Draper, the general manager and a member of the board of directors, respectively, of the district, and L. L. Dennett, the attorney thereof, denies that the district or the officers or attorney thereof violated the decree of the court, that the pumping by the district has in any way affected the flow of water to the canal of the San Joaquin & Kings River

Canal & Irrigation Company Incorporated, and alleges that as soon as they were notified that the water in the river had fallen below 1360 cubic feet per second the Tranquility Irrigation District ceased to pump; that the demand made by the San Joaquin & Kings River Canal & Irrigation Company was malicious and without any foundation, and that the Tranquility Irrigation District, in ceasing to pump in accordance with such demand, has suffered damage in an amount in excess of $100,000. The answer further alleges that the Tranquility Irrigation District has been engaged in perfecting the diverting works from the Kings River and is entitled to use and divert all of the waters of that river coming into Fresno Slough; that during the month of August, 1923, the district pumped the following amounts of water from Fresno Slough: August 1st, 42 second-feet; August 2d, 45 second-feet; August 3d, 42 second-feet; August 4th, 36 second-feet; August 5th, 30 second-feet; August 6th, 35 second-feet; August 7th, 41 second-feet; August 8th, 42 second-feet; August 9th, 47 second-feet; August 10th, 49 second-feet; August 11th, 53 second-feet; August 12th, 48 second-feet, and August 13th, 44 second-feet; that during all this time there was flowing by the diverting weir of the San Joaquin & Kings River Canal & Irrigation Company an amount in excess of 53 second-feet; that is to say, that at no time has the San Joaquin & Kings River Canal & Irrigation Company diverted into its canal all of the water in the San Joaquin River; that the major portion of the water diverted in the canal of the San Joaquin & Kings River Canal & Irrigation Company is not used to supply the water users from said canal, but is diverted by Miller & Lux, a corporation, upon riparian land covered with wild grasses and of little value, and that under and by virtue of the judgment and decree it is the right of the San Joaquin & Kings River Canal & Irrigation Company, and not of said Miller & Lux, to a priority over the land of the J. G. James Company; that due to the diversion of water from the Kings River and other sources the water level in the Tranquility Irrigation District has been raised until it is within four or five feet of the surface of the land, and the water in Fresno Slough is only about eight-tenths of a foot above the ground water level, and that if the Tranquility Irrigation District ceases to pump the water level will continue to rise and alkili will

be brought up from underground surfaces and the land in that district will be damaged and destroyed; that subsequent to the judgment the plaintiffs entered into agreements with certain power companies and had consented to the construction of reservoirs at Bass Lake, Kertchoff, and at Huntington Lake, where water has been stored, and that the storing of this water has materially affected the condition of the San Joaquin River and rendered it impossible for the purpose and intent of the judgment to be carried out and complied with; that on the San Joaquin River above Fresno Slough and the intake of the San Joaquin & Kings River Canal & Irrigation Company are various diverting ditches— Gravely Ford, Aliso Canal, and Lone Willow Slough—and it is alleged that the amount of water diverted through these diversions is greater than that to which the plaintiffs were entitled, and that if they were diverting the amount of water only to which they were entitled, then the amount of water flowing in the river at the intake of the canal would be greater than that specified in the judgment, and, finally, that the plaintiffs have maliciously and intentionally diverted the water, as alleged above, so as to reduce the flow of the San Joaquin River to a point where they could claim that the Tranquility Irrigation District was interfering with the flow of said river.

In the order for judgment the court found that "The evidence shows that the parties and persons cited to show cause in the above entitled action are in contempt of the order and judgment of the court by reason of the fact that they knowingly took in excess of thirty cubic feet of water per second more than the judgment herein permitted them. According to their own evidence they could not take as much as ten cubic feet of seepage water per second from Fresno Slough when there was less than 1360 cubic feet flowing at the head of plaintiff's canal. They could take seepage water only at that stage of river flow." On February 8, 1924, the defendants, R. C. McFarland, W. A. Draper, and L. L. Dennett, were each adjudged guilty of contempt of court and fined in the sum of fifty dollars each.

The judgment which the court found to be in full force and effect, the violation of which constituted the contempt, is as follows:

"That the plaintiff, The San Joaquin & Kings River Canal & Irrigation Company Incorporated, is entitled to take and divert from the San Joaquin river thirteen hundred and sixty (1360) cubic feet of water flowing therein per second at the head of its main and outside canals, situated in the County of Fresno near the confluence of the San Joaquin River and Fresno Slough, . . . and the right . . . is prior and superior to any right of the defendants to take or divert any of the water of the San Joaquin River or any water of the San Joaquin River being or flowing in the Fresno Slough and the said defendants . . . are forever enjoined, restrained and strictly prohibited from pumping, taking or diverting, or otherwise removing any of the waters of the San Joaquin River, or any of the waters of the San Joaquin River being or flowing in Fresno Slough from the channels of the said river or slough until the said plaintiff, the San Joaquin & Kings River Canal & Irrigation Company Incorporated, shall have received into the head of its said canals thirteen hundred and sixty (1360) cubic feet of the water of the San Joaquin River flowing therein per second, or so as to in any manner interfere with the flow of the water of the said San Joaquin River to the heads of said canals of the said plaintiff, or so as to in any way interfere with the diversion of said quantity of water by the said plaintiff."

The petition for a writ of review is based upon the contention that the judgment of the court was in excess of the jurisdiction thereof. In paragraph VII of the petition fifteen particulars are specified in which the excess of jurisdiction is claimed to appear. The argument is "that there was a complete lack of evidence that the Tranquility Irrigation District was taking any water from the San Joaquin River" and "that the Canal Company is entitled not to thirteen hundred and sixty (1360) cubic feet of water to do with as it wishes, but to thirteen hundred and sixty (1360) cubic feet of water for the purposes which gave rise to the injunction, and that it cannot complain if the Tranquility Irrigation District was pumping water when less than thirteen hundred and sixty (1360) cubic feet of water came to the canals of the Canal Company, unless the Canal Company wished to put that water to the beneficial use authorized by the judgment."

An order to show cause was ordered to issue by this court on February 21, 1924.

Respondents' brief points out (I) that the affidavits charging a violation of the decree constitute the complaint and the counter-affidavits of defendants the answer; that the only denial of any of the allegations of the affidavit was "one to the effect that the pumping of the said Irrigation District had not in any way interfered with or affected the flow of water into the canals of the Canal Company"; that the answer "expressly admitted the pumping of large quantities of water by the said district, from 47 to 53 second-feet continuously on the days in question, for which a violation of the injunction was claimed"; that the affirmative allegation in the answer that "by its pumping the Tranquility Irrigation District did not take out of Fresno Slough any more water than was coming into it from the Kings River and sources other than the San Joaquin River" was not supported by any evidence introduced by the defendants, and that the only issue was "whether under the circumstances the taking from Fresno Slough of the quantity of water (47 to 53 cubic feet per second), admittedly taken with the aid of the defendants with knowledge of the decree, was a violation of the injunction." The brief further points out (II) "That the water in Fresno Slough comes from the San Joaquin River has been determined by this court in litigation between the canal company and the predecessors in interest of the Tranquility Irrigation District," citing the two decisions in *Miller & Lux* v. *Enterprise Co.*, 169 Cal. 415 [147 Pac. 567], and *Miller & Lux* v. *James*, 180 Cal. 38 [179 Pac. 174]; (III) "The evidence independent of the decisions in the previous cases showed a willful and deliberate taking of water in violation of the decree"; (IV) "As there was no act in excess of jurisdiction on the part of the lower court its judgment is final," and (V) "But one issue could be tried in the contempt case and the jurisdiction of the court concerning the same was beyond question," there being no evidence to support the affirmative defenses set up by defendants in their counter-affidavits.

Petitioners' reply is based on the ground of lack of jurisdiction as shown in the affidavit of contempt. First, that no demand was made upon the Tranquility Irrigation Dis-

trict by or on behalf of the Canal Company to stop pumping, the notice having been given by the Miller & Lux Company; second, that the Canal Company was entitled to priority only for the public use determined in the original judgment; third, that the Tranquility Irrigation District was using the water pumped by it with the consent of the Canal Company and that there was nothing to show that the Canal Company had not abandoned its right to the water; fourth, that there is no evidence that the district did not use diligence in stopping its operations; fifth, that as to its attorney, L. L. Dennett, there is absolutely no evidence connecting him with the alleged contempt; sixth, that the Tranquility Irrigation District, as successors of the defendants in the original suit, are not guilty of contempt even if it diverted water from Fresno Slough belonging to the Canal Company; seventh, that proceedings in contempt can only be initiated by one beneficially interested, and Miller & Lux initiated the proceedings; eighth, that one not injuriously affected cannot complain and the Canal Company has not shown that it was injured; and ninth, that the fact that the contemners were officers and agents of the district does not of itself make them liable for a contempt of the district.

[1] The only question here is whether the evidence before the court is sufficient to sustain the adjudication of contempt. Regardless of the affirmative defenses and questions of fact raised by petitioners, if the affidavit of contempt was sufficient and there was sufficient evidence to support its allegations, the judgment of the lower court must be affirmed and the petition herein denied. (*In re Brambini*, 192 Cal. 19 [218 Pac. 569].)

The testimony taken upon the order to show cause is substantially as follows:

J. J. Hogue, a witness called on behalf of plaintiff, testified that he had been in the employ of the San Joaquin & Kings River Canal & Irrigation Company between three and four years, and was in charge of the water coming into the heads of plaintiff's canals at a place called Mendota, where a dam is maintained across the river. He stated that the Fresno Slough and Lone Willow Slough empty into the San Joaquin River near this dam and that the canals of the company take out above the dam, the effect of which

is to back up the water of the San Joaquin River into Fresno Slough. The White House gauge or measuring station is above the place where the Lone Willow Slough takes out of the river and is equipped with an automatic gauge recorder and a staff gauge recorder. A gauge station is also maintained at the Lone Willow Slough. He testified further: "Q. Now, the measurements that you took, how did you go about it? A. Well, at each measuring point, we had a station and the station is divided off into sections, according to the width of the stream. Q. Now, a station, what do you mean by a station? A. At the point where I took the measurements and the station is divided off into different sections and the first cross-section is taken of the channel and then the meter is lowered to the standard method and measurements are taken, readings are taken. Q. Did you lower the meter? A. Yes, sir. Q. How many measurements did you take across the stream, how many times did you lower your meter in the stream? A. At every section. Q. How far apart were those sections? A. Some of them were four and some ten, depending on the width of the stream. Q. You mean feet? A. Yes, sir. Q. What did you do then? A. Then, I took cross-sections, then I lowered the meter down. Q. What happened when you lowered the meter? A. See the revolutions. Q. What did those revolutions indicate? . . . A. Well, it indicates the velocity. Q. Now, after having gotten the velocity, what did you do next? A. Well, compute out the discharge. Q. What is that? A. Compute out the discharge over the area. Q. How did you do that? A. The area of the different sections, times the velocity; it is done according to the standard method? Q. What had you done about the standard method? A. I am going according to one now." He did not measure Fresno Slough but the measurements on the San Joaquin River, just above Lone Willow Slough, are as follows: "August 7th, 1420.91; August 8th, 1110; August 9th, 1000; August 10th, 1210; August 11th, 1300; August 12th, 1350; August 13th, 1090; August 14th, 986.04." The measurements on Lone Willow Slough, which takes out immediately below the above point, are as follows: "August 7th, 160 feet; August 8th, 127; August 9th, 125; August 10th, 137; August 11th, 147; August 12th, 158; August 13th, 127; August 14th, 118." No other water can come

into the San Joaquin River between the point of measurement above Lone Willow Slough and the place that the canals of the company take out at Mendota dam, and the amount of water flowing at the dam is the difference between these two streams. It appears, then, that on August 7th, at the head of the canal, there were 1260.91 second-feet; on August 8, 983; on August 9, 875; on August 10, 1073; on August 11, 1153; on August 12, 1192; on August 13, 963, and on August 14, 868.04. These figures represent the maximum amount of water that could possibly flow in the San Joaquin River at the head of the Canal Company's diverting works. However, no allowance is made for evaporation and seepage between the point of measurement and the intake of the canal. The witness further testified that during the days between August 7th to the 14th, inclusive, the Tranquility Irrigation District was pumping water out of Fresno Slough and R. C. McFarland was notified to close down the pumps as soon as possible; that he said the court decision did not amount to very much and he did not think they would stop pumping. In a letter he said the matter would be taken up with the attorney of the Tranquility Irrigation District before the pumps would be closed. On August 11th further notice was given by Miller & Lux Incorporated to the Tranquility Irrigation District to shut down its pumps as the water at the White House measured only 1000 second-feet. On August 12th, in a conversation with R. C. McFarland, the district was requested to shut down the pumps immediately. On August 14th the Tranquility Irrigation District notified Miller & Lux that the pumps had been closed down. On cross-examination J. J. Hogue testified that he made measurements at the main, outside, and Helm canals every week. For the week of August 7th they were as follows: At the outside canal, 270 feet; at the Helm, 330 feet, and at the main, 750 feet. On August 13th the measurements were as follows: In the outside canal, 162 feet; in the main canal, 708 feet, and in the Helm, 207 feet. No measurements of the water coming from Fresno Slough into the San Joaquin River were made, nor were any taken of the amount of water going over the Mendota weir. The witness stated that he did not know whether any water was coming from the Fresno Slough into the San Joaquin River or from the San Joa-

quin River into Fresno Slough or whether the water in Fresno Slough came from Kings River. However, from indications on the channel, there were about three feet of water in Fresno Slough for several weeks. The water that went over the Mendota weir was seepage through the boards. To explain the difference of 70.91 feet between the two figures given on August 7th, the witness said: "No doubt it was backed up at the weir; it was left above the weir as back water."

C. L. Kaupke, a witness called on behalf of plaintiff, testified that he had been an engineer since June, 1909, and connected with the state division of water rights since 1921; that on July 6, 1923, there was no water at Burrel, about twenty miles above the dam, in the Kings River that could flow into Fresno Slough to the head of the canals of the Tranquility Irrigation District; that the water ceased flowing at the head of the James Canal on June 11, 1923, and at the Beta main canal on July 16, 1923; that there is no source of supply of water for Fresno Slough other than San Joaquin River unless there is plenty of water in Kings River; that the only possibility is under surface streams and seepage water and that at McMullen, just above the diversion weir of the James Canal, there were not in excess of five or six second-feet of water on August 25, 1923.

E. T. A. Bartlett, a witness called on behalf of plaintiff, testified that he is a surveyor and since 1906 has been a civil engineer and in the employ of the San Joaquin & Kings River Canal & Irrigation Company for six and a half years; that the effect of the dam is to back up the water in Fresno Slough about 12 or 14 miles and that if the Tranquility Irrigation District operates its two pumps on Fresno Slough of approximately 50 second-feet capacity each, the water is withdrawn from the head of the canals of the San Joaquin & Kings River Canal & Irrigation Company.

R. C. McFarland, one of the petitioners, sought to show by illustrating a chart that the water pumped out of Fresno Slough by petitioners came from the Kings River. The chart indicated the constant increase of seepage from the Kings River, that is, that the water level had increased until it appeared at the time of the hearing that there is more water flowing in the Fresno Slough from seepage than is being pumped out. The witness declared that the chart showed

that the surface water in Fresno Slough was between one and two feet higher in 1923 than in 1922. The seepage water is claimed to come from the area of 27,000 acres in the Tranquility Irrigation District, the water level having raised "practically four feet and a half since last year." The following measurements, taken between August 15 and September 15, 1923, after the affidavit in contempt was filed, were given: One and four-tenths second-feet of water flowing in from the James Irrigation District to Fresno Slough as drainage water, an average of two second-feet flowing into Fresno Slough from the Kings River by-pass and the final average about ten second-feet of actual flow to the Fresno Slough. It was shown that measurements for thirty days do not vary three per cent. As tending to show that the Canal Company did not use all the water flowing in the San Joaquin River, the witness testified that on August 16th there was considerable water flowing over the Mendota weir, "practically about 25 feet flowing over the weir." On cross-examination he admitted that all he could show by the illustrated chart was the elevation of the water plane and that it was merely his conclusion or guess as to what caused the water to rise in Fresno Slough—whether it was seepage or whether it came down the river.

Petitioners claim that the evidence establishes the following facts: That the Canal Company was not using even the water flowing in the river, that Miller & Lux was permitted to divert water through the Helm Canal, the Helm Ditch, Lone Willow Slough, and Aliso Ditch, that the Canal Company did not object to the diversion of the water, that on August 12th the record at Lone Willow weir shows there were 1350 second-feet of water and that "unquestionably there was a considerable additional source of supply from Fresno Slough," that reservoirs on the San Joaquin River controlled by the Canal Company are storing water to which petitioners are entitled, that since the pumps of the Tranquility Irrigation District are practically at the head of the Fresno Slough and since the drainage of the reclamation district and the James Irrigation District discharges water below the pumps, evidence as to the amount of water coming in above the pumps is relatively unimportant, that there was coming into the Fresno Slough from sources other than the San Joaquin River, water greater in quantity than

that being pumped by the Tranquility Irrigation District, that on August 12th, with the water coming into Fresno Slough, there were more than 1360 second-feet of water flowing in the San Joaquin River, that on August 14th, after investigation, the Tranquility Irrigation District shut down its pumps, and that these facts do not sustain the adjudication of contempt.

[2] But even if this appraisal of the evidence be correct it does not sustain the contention of petitioners that the court was without jurisdiction to pronounce a judgment of contempt. They tried to show by their testimony that the Fresno Slough had an independent source of supply as great, or greater, than was pumped out. This was a question of fact to be determined by the court and in the face of the evidence the determination became final.

It is clear from the import of the judgment of injunction that the San Joaquin & Kings River Canal & Irrigation Company is entitled to take 1360 cubic feet of water per second out of the San Joaquin River "near the confluence of the San Joaquin River and Fresno Slough" and that the Tranquility Irrigation District is enjoined from taking any water of the San Joaquin River being or flowing in Fresno Slough until the Canal Company shall have received 1360 cubic feet of water per second of the San Joaquin River into the head of its canals. No attack is made on the jurisdiction of the court to issue the injunction. It is shown that the decree is in full force and effect; that petitioners are the successors of the defendants, the J. G. James Company, Incorporated, and the San Joaquin Valley Farm Lands Company, Incorporated; that they had knowledge of the full force and effect of the judgment and decree of injunction; that the pumping operations of the Tranquility Irrigation District on Fresno Slough withdraw water from the head of the canals of the San Joaquin & Kings River Canal & Irrigation Company; and, finally, by their own testimony, that they pumped 47, 49, and 53 second-feet of water from Fresno Slough on the ninth, tenth, and eleventh days of August when the water in the San Joaquin River measured, respectively, 1000, 1210, and 1300 cubic feet per second, and when on the said respective days only 875, 1073, and 1153 cubic feet per second of water were received into the canals of the company. The trial court declared that "ac-

cording to their own evidence, they could not take as much as ten cubic feet of seepage water per second from Fresno Slough when there was less than 1360 cubic feet flowing at the head of plaintiff's canal." It is true the witnesses for the Canal Company testified they did not know whether water was coming into Fresno Slough from other sources than the San Joaquin River and that no measurements had been taken of water flowing from the San Joaquin River into Fresno Slough. On the other hand, C. L. Kaupke testified that there is no source of supply of water in Fresno Slough other than the San Joaquin River unless there is plenty of water in Kings River, and that the only possibility of other sources of supply for Fresno Slough is under-surface streams and seepage water. He further testified that on July 6, 1923, at Burrel, about 20 miles above the dam, there was no water in the Kings River that could flow into Fresno Slough to the head of the canals of the Tranquility Irrigation District and that the water ceased flowing at the head of the James Canal on June 11, 1923, and at the Beta main canal on July 16, 1923. Furthermore, petitioner R. C. McFarland, although he testified that there were on the average ten cubic feet per second of seepage water in Fresno Slough, he admitted on cross-examination that all he could show by the chart was the water plane and that it was merely his conclusion and guess as to what caused the water to rise in Fresno Slough. In view of the testimony that water backs up into Fresno Slough from the San Joaquin River unless there is water coming into Fresno Slough from Kings River by reason of the Mendota dam, that in the earlier part of the season, that is, in July, there was no water that could flow into Fresno Slough from the Kings River, and that seepage water was not and could not be measured, the trial court could have found the source of the water in Fresno Slough contrary to the contention of petitioners. In other words, there is sufficient evidence to justify the court's finding that the greater portion of the three feet of water in Fresno Slough was water backed up into that stream by the Mendota dam.

The other points raised by petitioners may be briefly discussed. Petitioners claim that due diligence in stopping pumping operations on August 14, 1923, was shown to have been exercised. [3] Section 1209, subdivision 5, of the

Code of Civil Procedure provides that disobedience of any lawful judgment, order, or process of a court is a contempt and therefore diligence is not material as to the fact of disobedience. As to one of petitioners, L. L. Dennett, the attorney of the Tranquility Irrigation District, it is contended there is no evidence connecting him with the alleged contempt. [4] The testimony as to the conduct of the attorney in advising R. C. McFarland that the decree was "no good" and that he, McFarland, could have it set aside and that the district continued pumping on the advice of the attorney, is sufficient to support the judgment of contempt as to him. (*Ex parte Vance,* 88 Cal. 281 [26 Pac. 118].) [5] An injunction restraining a corporation, its officers, agents, and employees, is binding upon all persons acting for the corporation with full notice and knowledge of the injunction. (5 Cal. Jur. 894.) The claim is made that the Miller & Lux Company instituted the proceeding in contempt "to take an unconscionable advantage of the Tranquility Irrigation District, and to avoid, so far as Miller & Lux were concerned, the limitations imposed by the judgment in which the injunction was issued." As a matter of fact, the affidavit instituting the proceedings in contempt was subscribed and sworn to by the secretary of the Canal Company. [6] It is immaterial which company gave notice to cease pumping. Moreover, there is no provision requiring the parties to the original action in which the judgment has been rendered to institute proceedings in contempt. [7] A contempt is a separate and distinct proceeding and is no part of the original case out of which it arises. As a matter of practice the party most likely to institute proceedings would be the one beneficially interested in the judgment. [8] The final point that the Canal Company did not show any injury resulting from the alleged contempt may be disposed of by the remark that it is not necessary in order to constitute a contempt to show injury. The sole test is whether the judgment has been violated.

[9] The allegations of petitioners that conditions have changed and an additional supply of water developed and that water to which they are entitled is being impounded in reservoirs by the Canal Company are unsupported by evidence, and furthermore, if any testimony had been offered in support of the allegations it would clearly be

immaterial and irrelevant to the issue of contempt before the court. Moreover, petitioners could have recourse to an action at law to determine any relative rights that may have intervened subsequent to the granting of injunctive relief. It may be mentioned, however, that respondents, in answer to petitioners' claim that the Miller & Lux Company is using the water to which they are entitled, stated that Miller & Lux purchased the water from them and that even if taken wrongfully this would be no answer to a violation of the injunction by petitioners.

No attempt has been made herein to review the evidence so far as it affects or applies to the merits of the case; it has been considered solely for the purpose of ascertaining whether the court could have found the necessary jurisdictional facts therefrom. (*Strain* v. *Superior Court,* 168 Cal. 216 [Ann. Cas. 1915D, 702, 142 Pac. 62]; *White* v. *Superior Court,* 110 Cal. 60 [42 Pac. 480]; *Livingston* v. *Superior Court,* 117 Cal. 633 [38 L. R. A. 175, 49 Pac. 836].)

The order to show cause is discharged and the petition for a writ of review denied.

Richards, J., Waste, J., Lennon, J., Seawell, J., Shenk, J., and Myers, C. J., concurred.

Rehearing denied.