[Civ. No. 6209.   Third Appellate District.—July 20, 1939.]

CLEAR LAKE WATER COMPANY (a Corporation), Petitioner, v. THE SUPERIOR COURT OF MENDOCINO COUNTY et al., Respondents.

Neal Chalmers for Petitioners.

Burt W. Busch, District Attorney, and Huston, Huston & Huston for Respondents.

PULLEN, P. J.—In an action entitled, *"M. M. Gopcevic et al. v. Yolo Water & Power Co., a corporation, et al., defendants, and County of Lake et al., interveners"*, an order was made, adjudging Clear Lake Water Company, a corporation, in contempt of court, and sentencing said corporation to pay a fine of $500. This proceeding is for a review of that order.

Clear Lake is a body of water situated wholly within Lake County, with a surface of approximately 40,000 acres. The lake is fed by seasonal rains and the level is variable, depending upon the rainfall and evaporation.

Some time prior to 1920 the Yolo Water & Power Company, predecessor in interest of the petitioner herein, was organized to divert the surplus waters of Clear Lake to the farming lands lying below the lake in Yolo and Lake Counties. The only outlet to Clear Lake is through the channels of Cache Creek, which flows easterly through Yolo and Lake Counties, and finally terminates in a tule basin in the Yolo by-pass, some seventy-five miles from its source.

To control the wasting of the spring and winter rainfall in the Clear Lake basin, the Yolo Water & Power Company constructed a dam across Cache Creek about five miles downstream from the lake. This dam is equipped with fifteen gates, by means of which the flow of water out of Clear Lake and into Cache Creek is regulated. At the lower rim of the lake is a stratum of rock known as the Grigsby riffle, over which the waters flow into Cache Creek, and which impedes the run-off from the lake. The water company, in 1920, was contemplating the cutting of the Grigsby riffle, thereby deepening the outlet channel of the lake, when a proceeding entitled *"M. M. Gopcevic et al. v. Yolo Water & Power Company et al., defendants, and County of Lake et al., interveners"*, was commenced to enjoin the cutting of this barrier. In that proceeding a stipulation was entered into between the parties thereto, and a decree was signed, referred to herein as the "Gopcevic Decree", which, after permanently enjoining

the Yolo Water & Power Company from excavating or deepening the outlet of Clear Lake, further provided:

"That the agents, servants, employees, successors and assigns of the said defendants, and the said defendants, and each of them, and all persons acting under or in aid of them, or either of them, be perpetually enjoined and restrained from at any time or in any way raising the level of said lake in excess of 7.56 feet above zero on said Rumsey Gauge, and from at any time or in any way lowering the level of said lake below zero on said Rumsey Gauge; provided, however, that the rise of said Clear Lake, by reason of storm or flood conditions beyond the control of said defendants, or either of them, to a level in excess of 7.56 feet above zero on said Rumsey Gauge, but in no event to a level in excess of 9.00 feet above zero on said Rumsey Gauge, for any period not exceeding ten successive days, shall not be deemed a violation hereof."

In 1927, by mesne conveyances, the Clear Lake Water Company, a corporation, petitioner herein, became the successor in interest of all the rights and properties of the Yolo Water & Power Company, and still is the owner thereof.

Early in February, 1936, it began to rain, and continuing almost steadily for the next three weeks with a total of 10.17 inches of rainfall in the Clear Lake watershed, and on February 21, 1936, and continuing for some sixteen days thereafter, the established gauge showed that the level of the lake was in excess of 7.56 feet above zero. The records show that the average annual rainfall in the Clear Lake watershed for the past fifty years is 23.16 inches at Lakeport, 28.50 inches at North Lakeport, and 26.80 inches at Upper Lake, indicating that a fall in excess of ten inches in less than a month was probably an unusual occurrence.

Owing to the barrier known as the "Grigsby Riffle", the outlet channel which controls the amount of water passing through the dam had a capacity of but 2,600 cubic feet per second. It is therefore obvious that if the level of the lake was to be regulated by the gates in the dam, the operators thereof must anticipate to a certain extent the rainfall and run-off, and open the gates early enough so that the lake would still remain below the prescribed maximum.

From data introduced in evidence we have before us the rainfall during the period in question, the levels of the lake,

and the time of the opening of the gates in the dam, as follows:

| Date. | Hour. | Level of Lake. | Rainfall. | |
|---|---|---|---|---|
| Jan. 1, 1936 | 12 N. | 2.95 | | |
| " 15 " | 12 N. | 4.35 | | |
| Feb. 1 " | 12 N. | 5.38 | .45 | Feb. 2nd to |
| " 11 " | | | .84 | Feb. 14th. |
| " 12 " | | | 1.95 | Gates at dam |
| " 13 " | | | .92 | closed |
| " 14 " | | 6.47 | .42 | 11:50 A.M. |
| " 14 " | | | | 13 gates partially open. |
| " 15 " | 12 N. | 6.65 | | 13 gates partially open. |
| " 16 " | 12 N. | 6.90 | .75 | 15 gates open to capacity. |
| " 17 " | | 7.00 | .19 | |
| " 18 " | | 7.20 | 1.32 | |
| " 19 " | | 7.32 | .10 | Feb. 16th to March 7th, |
| " 20 " | | 7.33 | .16 | all gates wide open. |
| " 21 " | 12:30 P.M. | 7.45 | | |
| " 21 " | 5:00 P.M. | 7.55 | .85 | |
| " 21 " | 6:00 P.M. | 7.58 | | |
| " 22 " | | 7.76 | 1.21 | |
| " 23 " | | 7.88 | .35 | |
| " 24 " | | 8.00 | .15 | |
| " 25 " | | 8.17 | .50 | |
| " 26 " | 8:30 A.M. | 8.22 | | |
| " 26 " | 12:30 P.M. | 8.24 | | |
| " 27 " | | 8.23 | | |
| " 28 " | | 8.20 | | |
| " 28 " | | 8.18 | | |
| " 29 " | | 8.14 | | |
| Mar. 1 " | | 8.07 | | |
| " 2 " | | 8.00 | | |
| " 2 " | | 7.98 | | |
| " 3 " | | 7.93 | | |
| " 4 " | | 7.88 | | |
| " 5 " | | 7.79 | | |
| " 6 " | | 7.66 | | |
| " 7 " | | 7.60 | | |

Petitioner claims that the court erred in various particulars in adjudging it guilty of contempt for violation of certain of the provisions of the "Gopcevic Decree".

The first point urged is that the court should have sustained petitioner's demurrer, and granted its motion to

quash the contempt proceedings. This contention is based upon the claim that the affidavits presented to the trial court did not state facts sufficient to show that the defendant, Clear Lake Water Company, committed any act constituting a contempt, and that the affidavits were not sufficient to give the court jurisdiction to proceed, in that the affidavits did not charge petitioner with a violation of the "Gopcevic Decree", as there was no allegation that petitioner raised the level of Clear Lake above the elevation of 7.56, nor caused the level of the lake to remain above that maximum for more than ten days, nor that the petitioner, having it within its power to reduce the level of the water in Clear Lake, failed or refused to do so. This contention, however, cannot be taken seriously. The affidavits show that petitioner could control the level of the lake by the timely operation of its gates. It had control of the dam and when and to what extent the gates should be opened, which we think sufficiently shows the control of petitioner over the outlet. The affidavits set forth the particular terms of the decree relied upon, the knowledge of such terms by the Clear Lake Water Company, and the violation of the decree. No further averments seem to be necessary. (*In re Foss,* 123 Cal. App. 542, 544 [11 Pac. (2d) 676].) After the demurrer and motion to quash were denied, the company answered, and evidence similar to that set forth in the affidavits was received. Petitioner then moved to dismiss for failure of proof, but that motion was likewise properly denied.

The purpose of the construction of the dam and the impounding of the flood waters of Clear Lake was to provide water for irrigation purposes during the summer months. In order to protect the property owners around the borders of the lake, the fixing of the maximum and minimum levels was established, and also certain restrictions, not here important, as to the rapidity with which the level of the lake could be reduced.

When petitioner and its predecessor undertook to control the level of the waters of Clear Lake, they undoubtedly realized that they were dealing with a dangerous and uncertain element. The court, in establishing the range within which the level of the lake should be maintained, also had such uncertainty in mind when it provided that if by reason of storm or flood conditions beyond the control of the defendants, the level of the lake might reach to a point of 9 above zero, but

not for a period in excess of ten successive days, this would not be deemed a violation of the decree. This provision clearly was inserted to provide for such emergency.

It would therefore appear that it is not within the province of this court to establish any other or different variations, nor to provide for any greater emergency than that contemplated by the decree, for the trial court, having the parties before it, fixed a just, equitable and complete rule of operation for all concerned. The decree imposes upon petitioner the duty of operating the dam, and in anticipation of storm and flood conditions, it must open the gates of the dam in such time that a withdrawal of the water will reduce the level of the lake and take care of the anticipated storms and the consequent run-off within the prescribed times.

An examination of the schedule of the lake levels indicates that not only did the company take the ten days provided in the decree but also took an additional eight or nine days in which to draw down the level of the lake to the specified point of 7.56 feet. The trial court, in fixing this level, undoubtedly had in mind the fact that the water company derived a revenue from the sale of waters to the farmers along its distributing system, and also had in mind that bordering the lake there were farms, summer resorts and homes which demanded protection, and their owners definitely assured of a fixed water level. Neither side should be compelled or permitted to speculate on weather conditions, nor to ask a reviewing court for a modification of terms. Apparently the maximum was fixed at 9 feet above zero, believing that such maximum elevation would take care of all contingencies. The purpose of the decree was to establish and fix a definite and constant condition on the lake from year to year.

■ Petitioner does not deny the violation of the decree, but seeks to justify this violation by the claim that the unusual rainfall over the period of more than three weeks in February and March was something beyond its control. When the dam was erected and the decree was established, petitioner accepted all of the responsibilities that went with the act. The control of the gates and the level of the lake were in its keeping, subject to the limitations fixed by the court, and it cannot accept the benefits of control without assuming the responsibilities incident thereto. Petitioner cannot permit the lake to rise to the specified level and then open

the gates, claiming it had thereby done all that it is called upon to do to comply with the decree of the court.

Petitioner here attacks the jurisdiction of the court, and while the jurisdiction of the trial court to pass upon this matter must be measured by the sufficiency of the affidavits, such affidavits are sufficient to confer jurisdiction, unless they totally fail to charge a violation of the decree. (*In re Wood,* 194 Cal. 49 [227 Pac. 908].) As said in *In re Foss, supra,* even if the affidavits were "inartificially drawn" or the facts alleged merely "squinted" at a substantive statement of the offense, it would be sufficient.

Mere irregularity in the procedure does not affect jurisdiction, and a judgment rendered therein is valid regardless of such irregularity. (*In re Selowsky,* 189 Cal. 331, 334 [208 Pac. 99],)

It may have been, and undoubtedly was the intention of petitioner to so operate its dam as to inflict no damage upon property owners about the lake, but good intentions are no defense, which showing could have been, and undoubtedly was, considered by the trial court in mitigation of the punishment.

In *McFarland* v. *Superior Court,* 194 Cal. 407 [228 Pac. 1033], it appeared that respondent had been diligent in stopping pumping operations on the date specified, but the court, considering that point said:

"Section 1209, subdivision 5 of the Code of Civil Procedure provides that disobedience of any lawful judgment, order or process of a court is a contempt, and therefore diligence is not material as to the fact of disobedience."

In one of the affidavits, however, it is alleged that while operating its water system petitioners did "wilfully permit" the level of the lake to remain above 7.56 for a period longer than that prescribed by the decree.

These affidavits clearly show the decree of the court and its violation. This is sufficient to confer jurisdiction upon the court. Other points are presented, but we believe that what has been said is sufficient to justify the order of the court, and the petitioner has no cause to complain.

The judgment and order are affirmed.

Tuttle, J., and Thompson, J., concurred.