[Civ. No. 13439.   First Dist., Div. One.   May 25, 1948.]

EDWARD L. TURKINGTON et al., Appellants, v. THE MUNICIPAL COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent.

632

Wright & Larson and Heller, Ehrman, White & McAuliffe for Appellants.

Philip Adams and Emanuel Redfield, as Amici Curiae on behalf of Appellants.

J. W. Ehrlich, James Martin MacInnis, Victor E. Cappa and Roy A. Sharff for Respondent.

PETERS, P. J.—On February 25, 1946, Judge Twain Michelsen, who then and for some time prior thereto had been presiding over the traffic department of the Municipal Court of San Francisco, filed an affidavit and issued an order to show cause returnable before himself directing the 38 members of the Street and Highway Committee of the San Francisco Chamber of Commerce to show cause why they should not be punished for a constructive contempt described in the affidavit. The judge, on the same date, likewise signed an order shortening time, making the order returnable at 11 a. m. March 1, 1946, it being provided that service could be made up to 1 a. m. on March 1, 1946. Thus those accused of contempt had, at most, a little over three days to prepare their defense, and conceivably could have had but 10 hours. Most of the accused were served, appeared on the appointed day, filed formal appearances, and answers to the order to show cause. One of the accused—Don Fazackerley—in addition, filed a statement challenging the qualifications of the judge to hear the proceeding on the ground that the judge was biased and prejudiced. As to Fazackerley, the court continued the proceeding for one week. As to the rest of those appearing, the court, over vigorous objections of all of the accused then present that the court had no jurisdiction, proceeded to hear the contempt proceeding. At the conclusion of the hearing, the judge dismissed the proceeding as to some of the accused, found 20 of the accused guilty of contempt, fined each of them $25, and in default of payment, each was to be imprisoned in the county jail at the rate of one day's imprisonment for every $2.00 of the fine. The accused thereupon petitioned the superior court for a writ of certiorari. The writ was denied. The accused thereupon perfected two appeals, one joined in by nineteen of the accused, which is the appeal now under consideration, and the other perfected by Ernest Ingold alone, which will be considered hereafter, *post,* p. 651 [193 P.2d 808].

The affidavit of Judge Michelsen, which is the basis of this proceeding, avers that he was the traffic judge of the municipal court; that he had pending in his court many undetermined traffic cases; that the accused were members of the Traffic and Highway Committee of the Chamber of Commerce; that on February 23, 1946, the members of that committee issued and signed, and the newspapers published, a resolution reading as follows:

"WHEREAS, there exists in San Francisco an Automobile and Truck Traffic and Parking Problem recognized by all, and

"WHEREAS, by the creation of one way streets, limited and no parking areas, synchronization of traffic signals, sidewalk pavement and curb markings and signs, the condition was helped, and

"WHEREAS, the Judge of the Traffic Court presently presiding, has, for no reason, or for various reasons, condemned and criticized the regulations properly imposed, and

"WHEREAS, the Judge of the Traffic Court has by his public utterances and conduct brought disrespect, confusion, nonenforcement, violation, a worsened parking and traffic situation, and

"WHEREAS, the Judge of the Traffic Court has by his actions lessened the dignity and efficiency of his office as Judge, and has impaired or nullified the ability of the officers of the law charged with the enforcement of traffic and parking regulations to carry out their duty, all to the detriment of the city and its people,

"THEREFORE, BE IT RESOLVED, that this committee requests of the proper authorities that the present Judge of the Traffic Court, Twain Michelsen, be immediately removed from his office as unsuited to the duties required of him, and that he be replaced by a judge who will carry out the laws and regulations as they are properly established without discrimination, favor or personal bias."

The affidavit alleged that the "charges" in the resolution were untrue and avers that they "tended to and actually did: . . . Interfere with the orderly and due administration of justice in cases involving traffic laws and regulations; . . . Bring into disrepute the municipal court and the Judge thereof, and expose the court and said judge to public disfavor, distrust and suspicion." It is also generally alleged that such resolution impeded, embarrassed and obstructed the court and judge thereof in the discharge of its and his duties.

At the hearing of March 1, 1946, the appellants admitted joining in the resolution and in submitting it to the Board of Directors of the Chamber of Commerce, but they denied that they authorized or participated in its release to the newspapers, professing ignorance as to how the newspapers secured a copy of the resolution. ■ If the sufficiency of the evidence were the only point in the case, a quite logical argument could be made to the effect that the respondent failed to prove an essential element of the charge, and, in fact, failed to allege it properly. The affidavit merely alleges that after the resolution was adopted it was "distributed" to the newspapers, without alleging that the appellants in any way authorized or joined in such distribution. The evidence fails to cure that defect. The basis of the alleged contempt was that, because of the publication of the resolution in the newspapers, it tended to interfere with the orderly administration of the traffic court. Obviously, the mere adoption of the resolution and its transmittal to the board of directors could not have interfered with the orderly administration of the traffic court unless the resolution were brought to the attention of the court by publication or otherwise. The proof not only fails to show that appellants in any way authorized the publication, but shows that they did not. ■ It must be remembered that contempt proceedings are *quasi*-criminal in character (*Hutton* v. *Superior Court*, 147 Cal. 156 [81 P. 409]), and that judgments of conviction in such cases are governed by the rules applicable to criminal cases. (*Mattos* v. *Superior Court*, 30 Cal.App.2d 641 [86 P.2d 1056].) All of the elements of the charged contempt must be averred in the affidavit of the accuser and must be developed in the proofs. In the present case it might well be held that there was a fatal defect in the pleading and proof in that it was not pleaded or proved that appellants ever intended that their resolution should be brought to the attention of the court by publication or otherwise.

■ There is another preliminary matter to which reference should be made. The alleged contempt, if a contempt at all, was a constructive contempt and not a direct contempt. In a direct contempt, that is a contempt in the immediate presence of the court, the judge in whose presence the contempt was committed possesses the constitutional power to punish the offender summarily. (*Cooke* v. *United States*, 267 U.S. 517 [45 S.Ct. 390, 69 L.Ed. 767]; *Bulcke* v. *Superior*

*Court,* 14 Cal.2d 510 [94 P.2d 1006].) Such power is necessary to preserve the integrity of the court. In such a case no question of the disqualification of the judge affronted by the direct contempt can arise. The necessities of the case require that the affronted judge preside. But no such necessity exists in the case of an indirect or constructive contempt. The federal cases hold that unless there is some emergency, and none here was pleaded, proved or found, the affronted judge who prefers the charges should not sit in the contempt proceedings. Thus in the Cooke case, *supra,* page 539, the court stated:

"The power of contempt . . . is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible. . . . All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place. [Citing cases.]

"The case before us is one in which the issue between the judge and the parties had come to involve marked personal feeling that did not make for an impartial and calm judicial consideration and conclusion, as the statement of the proceedings abundantly shows. We think, therefore, that when this case again reaches the District Court to which it must be remanded, the judge who imposed the sentence herein should invite the senior circuit judge of the circuit to assign another judge to sit in the second hearing of the charge against the petitioner."

In *Cornish* v. *United States,* 299 F. 283, another constructive contempt case, the federal court stated (p. 285): "Another matter should be mentioned. The publication claimed to be contemptuous was dominantly a libel upon the individual judge who had issued the injunction. In such a case, and where there is no impelling necessity or exigency, we greatly deprecate the prosecution of contempt proceedings before that

same judge. . . ." (See, also, *Toledo Newspaper Co.* v. *United States,* 237 F. 986, 988 [150 C.C.A. 636] ; *Coll* v. *United States,* 8 F.2d 20, 24.)

The thought expressed in these cases applies with particular force to the instant case. The charges contained in the resolution constituted an accusation against the character and integrity of Judge Michelsen. It was he who filed the affidavit. He then secured the services of two attorneys to represent him in prosecuting the case. He then acted as judge and jury in trying the proceeding over appellants' vigorous objections. Thus the person claiming to be the victim became the accuser, prosecutor, judge and jury. The proceeding became, in effect, a means of vindicating Judge Michelsen rather than a means of vindicating the integrity and dignity of the court. It must be remembered that a judge as a judge is no more permitted to use the contempt process to punish an affront than is a private individual. The only justification for a contempt proceeding is to punish an interference with the orderly administration of justice. It is most important that contempt proceedings be put, as far as possible, beyond the reach of even unjust criticism. Where the alleged contempt is an indirect one, and where it consists of charges made against a particular judge, in the absence of some impelling necessity, the judge who has been affronted should not preside over the proceedings.

This issue, relating to the possibility of the disqualification of Judge Michelsen, becomes even more pointed when the facts relating to the Fazackerley statement challenging the judge's qualifications are considered. On the return date of the order to show cause Fazackerley filed his statement challenging the qualifications of the judge, and requesting that another judge hear the matter, on the grounds that Judge Michelsen was interested in the action being the complaining witness, and because he was "biased and prejudiced so that a fair and impartial trial cannot be had before him." In support of the charge various statements purportedly made by Judge Michelsen to the reporters and printed in the newspapers are quoted, in which various heated countercharges were allegedly made by the judge. Fazackerley prayed "on behalf of himself and the other parties hereto" that another judge be assigned to hear the proceeding. Judge Michelsen, in apparent compliance with section 170 of the Code of Civil Procedure, ruled that the proceeding as to Fazackerley should

be continued one week, but held that the appellants had no right to urge the disqualification issue based on the Fazackerley statement because they had not individually filed similar statements. The appellants persistently requested a continuance to permit the judge's qualifications to be passed upon, but all such motions were denied. What happened to the contempt proceeding against Fazackerley, or to his challenge against the judge, does not appear in the present record.

There is some merit in the argument that, when Judge Michelsen's qualifications were challenged by Fazackerley on a ground not limited solely to Fazackerley but applicable to all of the accused, the effect of such challenge was to deprive the challenged judge of jurisdiction over the proceeding until his qualifications had been passed upon. ▪▪▪ Of course, if the judge were disqualified, all of his actions in the proceeding, after such disqualification appeared, would be void. (*Giometti* v. *Etienne,* 219 Cal. 687 [28 P.2d 913] ; *Briggs* v. *Superior Court,* 215 Cal. 336 [10 P.2d 53] ; *Cadenasso* v. *Bank of Italy,* 214 Cal. 562 [6 P.2d 944].) Section 170(5) of the Code of Civil Procedure provides that : ''When it is made to appear probable that, by reason of bias or prejudice of such justice, judge or justice of the peace a fair and impartial trial cannot be had before him,'' he shall not sit or act in the action or proceeding involved. The same section also provides for the judge disqualifying himself when he has knowledge of any facts that would disqualify him under the section, but if such facts exist and he fails to disqualify himself ''any party to such action or proceeding who has appeared therein'' may present and file a written statement of objection to ''the hearing of such matter or the trial of any issue of fact or law in such action or proceeding before such judge.'' The section requires that the statement of objection ''shall be presented at the earliest practicable opportunity, after his appearance and discovery of the facts constituting the ground of the judge's disqualification, and in any event before the commencement of the hearing of any issue of fact in the action or proceeding before such judge.'' When such a statement is filed it is then provided that the challenged judge is deprived of power to pass on the question of his own qualifications, and that such question shall be passed upon by another judge. Of course, until such question is decided, the challenged judge is without jurisdiction to proceed.

▪▪▪ Now what does this section mean? It does not specifically provide for the disqualification *in toto* of the chal-

lenged judge as to all parties to an action when only one party, or any greater number but less than all, files a statement of disqualification on grounds applicable to all of the parties. But, although the section contains no express language on this subject, the proper interpretation of the language that is used would seem to indicate that, once a judge is challenged on such grounds, his right to proceed over the entire proceedings is suspended until the basic question of his qualifications is determined. As already noted, the section provides that no judge shall act in any action or proceeding when it is made to appear probable that a fair and impartial trial cannot be had before him, and then the section allows any party to file the required statement. It is not difficult to spell out of such language a purpose to disqualify the judge from presiding over the proceeding once the showing of disqualification is made by anyone having the right to raise the issue, i. e., by any party. It is the fact of disqualification that is important, not who raises it, as long as it is raised as provided in the section. It is most important that the decisions of courts should be afforded the respect and confidence of the community, but, in order to warrant such respect and confidence, it is fundamental that such decisions should be above the suspicion that they were rendered by a judge who was biased and prejudiced and had an interest in the litigation. (See, generally, *Lindsay-Strathmore I. Dist.* v. *Superior Ct.,* 182 Cal. 315, 333 [187 P. 1056].) It could well be argued that the Fazackerley statement redounded to the benefit of all of the accused, particularly where all of the accused called the attention of the court to the facts that the prayer of the statement was on behalf of Fazackerley and all of "the other parties hereto," and that "the other parties" desired to urge the same grounds of disqualification.

While it is true that, since the amendments to section 170 of the Code of Civil Procedure, a failure to urge the disqualification on the grounds of bias and prejudice as provided in the section may, under some circumstances, constitute a waiver of the objection (*Krebs* v. *Los Angeles Ry. Corp.,* 7 Cal.2d 549 [61 P.2d 931]), there can be no doubt that the Fazackerley statement was filed within the time limited in the section. As already pointed out, the section requires the statement to be filed at the "earliest practicable opportunity" and "before the commencement of the hearing of any issue of fact." Here the statement was filed before the hearing of

any issue of fact. It was filed within four days of the filing of the charges. The exact date Fazackerley was served does not appear. There was no impelling reason for haste. Certainly four days, and perhaps much less, cannot be held to be an unreasonable time. Moreover, Judge Michelsen must have believed that the Fazackerley statement was filed in time because, as soon as it was called to his attention, he immediately and quite properly continued the proceeding as to Fazackerley. Under such circumstances respondent is in no position to argue now that the statement was filed too late.

In apparent recognition of the fact that the Fazackerley statement, if in proper form, might have disqualified the judge as to all of the parties, respondent argues that even as to Fazackerley the statement of disqualification was legally insufficient. In this respect respondent points out that such statement urged as grounds for disqualification certain newspaper articles containing ''quotations of said Judge Twain Michelsen's comments and statements'' about the controversy, which, on information and belief, are alleged correctly to quote the judge, and which, it is claimed, showed that the judge was ''inflamed and biased.'' Respondent then cites the well-settled rule that affidavits of disqualification are generally held insufficient when they merely state the conclusions of the affiant, or are based on hearsay. (*Ephraim* v. *Superior Court*, 42 Cal.App.2d 578 [109 P.2d 378]; *People* v. *Nolan*, 126 Cal.App. 623 [14 P.2d 880].)

There are two answers to this contention. It must be remembered that Judge Michelsen does not contend that he did not make the statements in question, nor does he contend that he was misquoted. He based his charges against appellants on newspaper articles quoting the resolution, without even alleging on information and belief or otherwise that the appellants had authorized the publication of such articles. In view of the nature of the controversy, it was most appropriate for Fazackerley to cite newspaper articles purporting to quote the judge on the issue involved. Under such circumstances the statement was legally sufficient. This conclusion is strengthened by the fact that the judge's personal interest in the case was apparent to all, he being the victim, accuser, prosecutor, court and jury.

In the second place, respondent is in no legal position to urge at this late date that the Fazackerley affidavit was insufficient. Judge Michelsen treated the statement as a proper one, and continued the matter as to Fazackerley for one week.

He thus ruled that the statement was sufficient, and respondent, not having appealed, is in no position to challenge such ruling.

■ Any of the points heretofore discussed might well require a reversal, but it is not necessary to rest our decision solely on any one or all of such points. There is another and conclusive reason why the order denying the writ of certiorari must be reversed, and that is that the publication of the resolution (assuming appellants authorized its publication) was not a constructive contempt at all. To punish appellants on such a charge would constitute an invasion of their constitutional right of free speech. The constitutional guarantee is a fundamental one and is couched in the broadest of language. The right thus guaranteed is, of course, not unlimited. One such limitation is that no person is permitted to impede the orderly administration of justice. If a person, by false charges against a court, does directly interfere with the administration of justice he may be punished for a constructive contempt, and the constitutional guarantee will not protect him. But before he can be so punished the false charges must be of such a nature that they not only have a "reasonable tendency" to obstruct justice, but also must constitute "a clear and present danger" to the administration of justice. Intemperate language, false charges, and unfair criticism, no matter how strongly expressed, may be in bad taste, but they do not constitute a constructive contempt unless there is an immediate, clear and present danger imperiling the administration of justice. These principles have been firmly fixed by the recent decisions of the United States Supreme Court, and those decisions, interpreting as they do a provision of the United States Constitution, are binding on this court.

In the early federal cases there appears some confusion as to where the right of free speech or of the press ended and the right to punish for contempt began. In *Toledo Newspaper Co.* v. *United States*, 247 U.S. 402 [38 S.Ct. 560, 62 L.Ed. 1186], the Supreme Court attempted to clarify this confusion and laid down the rule that a false utterance could be punished as a contempt if it had "a reasonable tendency" to interfere with the administration of justice. To use the exact words of the court (p. 421): ". . . the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case." But as early as

*Schenck* v. *United States,* 249 U.S. 47 [39 S.Ct. 247, 63 L.Ed. 470], this concept began to be questioned, and the so-called "clear and present danger" test began to be discussed. Finally, in *Nye* v. *United States,* 313 U.S. 33, 52 [61 S.Ct. 810, 85 L.Ed. 1172], the court expressly overruled the Toledo Newspaper Co. case insofar as it held that the test was the "reasonable tendency to obstruct justice," and again spoke of the "clear and present danger" test. Then in *Bridges* v. *California,* consolidated with *Times-Mirror Co.* v. *Superior Court,* 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192], decided in 1941, the court attempted to define more clearly the principles that should control in determining in a particular case whether the constitutional right of free speech or the common law duty of court to protect the right to a fair trial should prevail. In both of these cases the petitioners had been found guilty of contempt and the Supreme Court of California had affirmed (*Bridges* v. *Superior Court,* 14 Cal.2d 464 [94 P.2d 983]; *Times-Mirror Co.* v. *Superior Court,* 15 Cal.2d 99 [98 P.2d 1029]), and the Supreme Court of United States reversed. In the Times-Mirror case the facts were that two labor union members had been convicted of assault. The trial court had pending before it applications for probation. Under such circumstances the newspaper in its editorial columns discussed the merits of the cases at length, vigorously denounced the two men who had been convicted, and strongly recommended that the trial court should deny probation. In the Bridges case a motion for a new trial was pending in a labor dispute case. While such motion was pending Bridges telegraphed to the Secretary of Labor condemning the decision as "outrageous" and threatened that unless a new trial were granted he would call a Pacific Coast strike. In both cases the comment was about a pending case, and in both cases strong, intemperate and untrue remarks were made. The Supreme Court of the United States assumed that in both cases the accused were attempting to influence the course of pending litigation in the trial court. In both cases the trial court found, and the Supreme Court of California affirmed the finding, that the acts had a reasonable tendency to interfere with the orderly administration of justice. Nevertheless, the judgment was reversed, the Supreme Court holding that, as a matter of law, the comments did not present a clear and present danger to the orderly administration of justice. The majority of the court (the decision was 5 to 4) pointed out that prior decisions had established the rule that the con-

stitutional right to free speech must be protected unless the comments about a court or judge are of such a nature "as to create a clear and present danger that they will bring about the substantive evils." (P. 261.) At page 262 it is stated:

"Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be 'substantial,' . . . it must be 'serious,' . . .

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. . . For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

The court then refutes the argument that, regardless of the free speech provision, this country adopted the English common law on the subject of contempts where a "mere tendency to obstruct justice" is all that is required, and then stated (p. 270):

". . . The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

"The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. But we cannot start with the assumption that publications of the kind here involved ac-

tually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases.''

At page 273 appears the following comment: "In accordance with what we have said on the 'clear and present danger' cases, neither 'inherent tendency' nor 'reasonable tendency' is enough to justify a restriction of free expression." The court then held that the editorials and telegram did not create, as a matter of law, a clear and present danger.

There thus emerges from the Bridges' case a rule that had been strongly hinted at in earlier cases, but now couched in the strongest and most positive language, to the effect that a false publication that merely tends to obstruct justice is not sufficient to justify the interference with the constitutional right to free speech by punishment for contempt, and that there must accompany such tendency a clear and present danger of such obstruction. Such danger must be both "imminent" and "serious."

It is true that the Bridges' case was a five-to-four decision, but that case does not stand alone. Five years later, in 1946, the Supreme Court reaffirmed that case in *Pennekamp* v. *Florida,* 328 U.S. 331 [66 S.Ct. 1029, 90 L.Ed. 1295]. There were no dissents in the Pennekamp case, but three justices wrote separate concurring opinions. In this case the contempt charges were based on newspaper editorials bitterly, unfairly, and untruthfully attacking the Florida circuit judges for dismissing certain criminal charges. The Florida courts found that the newspaper had willfully and recklessly withheld the truth from the public, and that the motive behind the publication was to abuse and destroy the efficiency of the courts, and on this ground the Florida Supreme Court affirmed the convictions. (156 Fla. 227, 22 So.2d 875].) Nevertheless, all of the justices participating in the four opinions of the Supreme Court of the United States held that the judgment must be reversed. The majority opinion had this to say about the Bridges' case (p. 334):

"*Bridges* v. *California* fixed reasonably well-marked limits around the power of courts to punish newspapers and others for comments upon or criticism of pending litigation. The case placed orderly operation of courts as the primary and dominant requirement in the administration of justice. . .

This essential right of the courts to be free of intimidation and coercion was held to be consonant with a recognition that freedom of the press must be allowed in the broadest scope compatible with the supremacy of order. A theoretical determinant of the limit for open discussion was adopted from experience with other adjustments of the conflict between freedom of expression and maintenance of order. This was the clear and present danger rule. The evil consequence of comment must be 'extremely serious and the degree of imminence extremely high before utterances can be punished.' . . . It was, of course, recognized that this formula, as would any other, inevitably had the vice of uncertainty, . . . but it was expected that, from a decent self-restraint on the part of the press and from the formula's repeated application by the courts, standards of permissible comment would emerge which would guarantee the courts against interference and allow fair play to the good influences of open discussion. As a step toward the marking of the line, we held that the publications there involved were within the permissible limits of free discussion.'' The majority opinion then also stated (p. 344):

''From the editorials, the explanations of the petitioners and the records of the court, it is clear that the full truth in regard to the quashing of the indictments was not published. We agree with the Supreme Court that the Rape Cases were pending at the time of the editorials. We agree that the editorials did not state objectively the attitude of the judges. We accept the statement of the Supreme Court that under Florida law, 'There was no judgment that could have been entered in any of them except the one that was entered.' 156 Fla. at 240, 22 So.2d at 882. And, although we may feel that this record scarcely justifies the harsh inference that the truth was willfully or wantonly or recklessly withheld from the public or that the motive behind the publication was to abase and destroy the efficiency of the courts, we may accept in this case that conclusion of the Florida courts upon intent and motive as a determination of fact. . .

''The acceptance of the conclusion of a state court as to the facts of a situation leaves open to this Court the determination of federal constitutional rights in the setting of those facts.''

The court then had this to say about the basic principles involved (p. 346): ''Free discussion of the problems of so-

ciety is a cardinal principle of Americanism—a principle which all are zealous to preserve. Discussion that follows the termination of a case may be inadequate to emphasize the danger to public welfare of supposedly wrongful judicial conduct. It does not follow that public comment of every character upon pending trials or legal proceedings may be as free as a similar comment after complete disposal of the litigation. Between the extremes there are areas of discussion which an understanding writer will appraise in the light of the effect on himself and on the public of creating a clear and present danger to fair and orderly judicial administration. Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.''

And at page 348 appears this language: ''The comments were made about judges of courts of general jurisdiction— judges selected by the people of a populous and educated community. They concerned the attitude of the judges toward those who were charged with crime, not comments on evidence or rulings during a jury trial. Their effect on juries that might eventually try the alleged offenders against the criminal laws of Florida is too remote for discussion. Comment on pending cases may affect judges differently. It may influence some judges more than others. Some are of a more sensitive fiber than their colleagues. The law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess any more than it generally can depend on the personal equations or individual idiosyncrasies of the tort-feasor. . . We are not willing to say under the circumstances of this case that these editorials are a clear and present danger to the fair administration of justice in Florida. . . .

''What is meant by clear and present danger to a fair administration of justice? No definition could give an answer. Certainly this criticism of the judges' inclinations or actions in these pending nonjury proceedings could not directly

affect such administration. This criticism of their actions could not affect their ability to decide the issues. . .

"It is suggested, however, that even though his intellectual processes cannot be affected by reflections on his purposes, a judge may be influenced by a desire to placate the accusing newspaper to retain public esteem and secure reelection presumably at the cost of unfair rulings against an accused. In this case too many fine-drawn assumptions against the independence of judicial action must be made to call such a possibility a clear and present danger to justice. For this to follow, there must be a judge of less than ordinary fortitude without friends or support or a powerful and vindictive newspaper bent upon a rule or ruin policy, and a public unconcerned with or uninterested in the truth or the protection of their judicial institutions. If, as the Florida courts have held and as we have assumed, the petitioners deliberately distorted the facts to abase and destroy the efficiency of the court, those misrepresentations with the indicated motives manifested themselves in the language employed by petitioners in their editorials. The Florida courts see in this objectionable language an open effort to use purposely the power of the press to destroy without reason the reputation of judges and the competence of courts. This is the clear and present danger they fear to justice. Although we realize that we do not have the same close relations with the people of Florida that are enjoyed by the Florida courts, we have no doubt that Floridians in general would react to these editorials in substantially the same way as citizens of other parts of our common country.

"As we have pointed out, we must weigh the impact of the words against the protection given by the principles of the First Amendment, as adopted by the Fourteenth, to public comment on pending court cases. We conclude that the danger under this record to fair judicial administration has not the clearness and immediacy necessary to close the door of permissible public comment. When that door is closed, it closes all doors behind it."

The latest expression of the United States Supreme Court on this subject is to be found in *Craig* v. *Harney,* 331 U.S. 367 [67 S.Ct. 1249, 91 L.Ed. 1546], decided in May, 1947. The majority opinion was joined in by six justices and another wrote a very strong concurring opinion. Two justices dissented. Here the Texas courts had attempted to punish a

publisher, an editorial writer and several reporters for editorial attacks and news stories unfairly and untruthfully commenting on the actions of an inferior court judge in granting a directed verdict against a serviceman tenant in a forcible detainer action. The alleged contemptuous publications were made while the motion for a new trial was still pending, and were found by the Texas courts to have been made with the intent to influence the court to grant the new trial. (*Ex parte Craig,* —— Tex. Cr. —— [193 S.W.2d 178].) After referring to the very strong findings of the Texas courts, the Supreme Court reviewed the law on the subject as follows (p. 371) : "The court's statement of the issue before it and the reasons it gave for holding that the 'clear and present danger' test was satisfied have a striking resemblance to the findings which the Court in *Toledo Newspaper Co.* v. *United States,* . . . held adequate to sustain an adjudication of contempt by publication. That case held that comment on a pending case in a federal court was punishable by contempt if it had a 'reasonable tendency' to obstruct the administration of justice. We revisited that case in *Nye* v. *United States,* . . . and disapproved it. And in *Bridges* v. *State of California, supra,* we held that the compulsion of the First Amendment, made applicable to the States by the Fourteenth . . . forbade the punishment by contempt for comment on pending cases in absence of a showing that the utterances created a 'clear and present danger' to the administration of justice. . . We reaffirmed and reapplied that standard in *Pennekamp* v. *State of Florida, supra,* which also involved comment on matters pending before the court."

The court then expressed itself as follows (p. 375) : "The only substantial question raised pertains to the editorial. It called the judge's refusal to hear both sides 'high handed,' a 'travesty on justice,' and the reason that public opinion was 'outraged.' It said that his ruling properly 'brought down the wrath of public opinion upon his head' since a serviceman 'seems to be getting a raw deal.' The fact that there was no appeal from his decision to a 'judge who is familiar with proper procedure and able to interpret and weigh motions and arguments by opposing counsel and to make his decisions accordingly' was a 'tragedy.' It deplored the fact that the judge was a 'layman' and not a 'competent attorney.' It concluded that the 'first rule of justice' was to give both sides an opportunity to be heard and when that

rule was 'repudiated,' there was 'no way of knowing whether justice was done.'

"This was strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one 'who ventures to publish anything that tends to make him unpopular or to belittle him . . .' . . . The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil."

The court thereupon held that the publications, as a matter of law, did not constitute a clear and present danger within the meaning of the Bridges and Pennekamp cases.

The reasoning of these three cases is conclusive in the instant case. The language of the questioned resolution was not nearly so intemperate or unfair as that employed by those charged in the Pennekamp and Craig cases. We may assume that the charges contained in the resolution against Judge Michelsen were untrue, and we may assume that such charges were intended to affect his actions in pending traffic cases. But that is not the test. Even though the criticism of a judge's actions in a pending case is untruthful, is harsh and intemperate, and arises out of improper motives, it does not constitute a contempt unless there is a "clear and present danger" to the orderly administration of justice, and such danger must be "serious" and "imminent." The resolution amounts to a criticism of the general "attitude" of Judge Michelsen toward the traffic regulations, the public officers whose duty it was to enforce them, and charges that he favored certain traffic offenders. It will be recalled that in the Pennekamp case the publications likewise criticized the "attitude" of the district judges toward persons charged with public offenses, and the writings there made specific mention of particular pending cases. The statements that Judge Michelsen's actions had "lessened his dignity and efficiency" and that he should be removed as "unsuited to the duties required of him" might have the "tendency to make him unpopular or to belittle him," but this was held, in the Craig case, to furnish no foundation for contempt proceedings, unless "the fires which it kindles constitute an imminent and not merely a likely threat to the administration of justice." That one judge is more sensitive to public

criticism than another does not empower the former to limit without sufficient cause the constitutional privilege of free speech. (*Pennekamp* v. *Florida, supra.*) Likewise, the charge that he "discriminated," "favored" and was "personally biased" to the advantage of charged offenders is within the permissible range of free comment as set out in the Pennekamp and Craig cases. In the Pennekamp case the judges were also charged with such favoritism of persons accused of crime, and in that case particular charged crimes were pointedly discussed. The publication in the Craig case charged favoritism of the judge toward the litigant who was opposing the serviceman. Indeed, the publications in the Craig case charged that the judge had gone so far as to even refuse to allow the serviceman "to be heard" on his own behalf. If such language as was used in the Pennekamp and Craig cases did not constitute an "imminent threat" to the administration of justice, it would seem certain that the language of the resolution herein cannot be held to have been such a threat.

The holdings of the United States Supreme Court are binding on this court insofar as they constitute an interpretation of the federal Constitution. These holdings are based on the fundamental concept that the right of free speech is essential in a democracy, and should not be limited by the use of the contempt process except where there is a real impediment to the orderly administration of justice. In a society where the courts constitute a free and independent branch of the government, the judges of such courts cannot expect to be free from the perils of criticism and comment, any more than other public officials are free from such criticism or comment, except where such comment directly imperils the outcome of pending litigation. In a democracy, public officials, and this, within the limits above discussed includes judges, cannot expect to live in a rarefied environment where they are free from criticism. They must expect to live in a more rugged atmosphere where their acts and qualifications are subjected to the perils of even pitiless publicity. Respect for the judiciary can never be secured in the minds and the hearts of the people by shielding the judges from such criticism. The dignity of the bench can never be preserved by muzzling those who desire to criticize. Enforced silence engenders suspicion and distrust, not respect. A judge must be presumed to possess judicial stamina, firmness

and fortitude. He must be presumed to have the backbone to withstand the rigors of even unfair criticism. To hold, in the instant case, that the resolution involved constituted an ''imminent'' peril to the orderly administration of justice would require us to impute to the judge criticized a lack of the attributes we must presume he possesses. This we are not inclined to do.

The order appealed from is reversed.

Ward, J., and Bray, J., concurred.