[No. G011879. Fourth Dist., Div. Three. Aug. 28, 1992.]

BRAD GATES, as Sheriff-Coroner, etc., Plaintiff and Respondent, v.
THE MUNICIPAL COURT FOR THE JUDICIAL DISTRICT OF
ORANGE COUNTY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

**COUNSEL**

Rutan & Tucker and Philip D. Kohn for Defendant and Appellant.

Terry C. Andrus, County Counsel, Thomas C. Agin and James L. Turner, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.**—In the very first decision reported by the California Supreme Court, *People* v. *Smith* (1850) 1 Cal. 9, a man accused of murder was ordered released on bail pending trial, in part because there was no jail in which to keep him. Albeit on a somewhat larger scale, we have a similar problem almost a century and a half later. The Orange County jails are full. Incredibly, because the sheriff will not lock up everybody sent him, some judges of the central municipal court now want to put *him* in jail. As we explain, this is akin to shooting the messenger who bears ill tidings.

I

Sheriff Gates comes to us after traveling a long and rocky road. We briefly summarize his journey. In the late 1970's, the American Civil Liberties Union (ACLU) filed a class action lawsuit in the local federal district court on behalf of inmates of the main Orange County jail, contending the facility was overcrowded in violation of the cruel and unusual punishment clause of the United States Constitution. During the litigation Judge William P. Gray paid a visit to the jail. He noticed, in his own words, "several instances in which an inmate was sleeping on his assigned mattress that had been placed directly on the concrete floor of a cell, immediately adjacent to the toilet, because all of the bunks were allotted to other prisoners." (*Stewart* v. *Gates* (C.D.Cal. 1978) 450 F.Supp. 583, 588.)

Judge Gray found the spectacle constitutionally intolerable. He wrote: "If the public, through its judicial and penal system, finds it necessary to

incarcerate a person, basic concepts of decency, as well as reasonable respect for constitutional rights, require that he be provided a bed." (*Ibid.*) He then made an order that every prisoner kept in the central jail "will be accorded a mattress and a bed or bunk upon which to sleep." (450 F.Supp. at p. 590.)

The matter then languished for seven years. During that period, the jail population of the rapidly growing county continued to outpace available incarceration facilities. The extent to which Gates attempted to comply with the 1978 federal court order during those seven years is the subject of some dispute. Gates, of course, contends he made every effort to comply short of actually releasing prisoners. Nevertheless, in 1985, the federal court found his efforts deficient and held him in contempt of court. He was fined $50,000 plus $10 per night "for every inmate who does not have a bed or bunk on which to sleep the first night." A year later, the federal court placed a limit of 1,296 inmates on the men's main jail.

To make more room at the main jail, the Orange County Sheriff's Department stopped accepting public drunks, parole violators, and prisoners from various federal agencies, such as the FBI and the immigration service. Inmates who might not otherwise be confined in minimum security conditions were so confined. Other inmates were released early where possible. Some inmates convicted of certain crimes (e.g., possession of narcotics) were transferred to the two other jail facilities in the county (the Lacy and Musick facilities).

Gates also instituted a cite and release program for pretrial arrestees. In developing the release program, however, Gates and his lieutenants were unaware that a particular provision of the California Penal Code, section 827.1, precludes the pretrial release of persons arrested for certain crimes, or who come within certain categories.[1]

The presiding judge of the Central Orange County Municipal Court brought this fact to the attention of sheriff deputies present in a meeting at

---

[1]All further references to section 827.1 are to the Penal Code. The section permits the release of misdemeanor offenders upon the issuance of a citation in lieu of physical arrest, but specifically excludes misdemeanor offenders who fall into certain categories. It reads as follows:

"A person who is specified or designated in a warrant of arrest for a misdemeanor offense may be released upon the issuance of a citation, in lieu of physical arrest, unless one of the following conditions exists: [¶] (a) The misdemeanor cited in the warrant involves violence. [¶] (b) The misdemeanor cited in the warrant involves a firearm. [¶] (c) The misdemeanor cited in the warrant involves resisting arrest. [¶] (d) The misdemeanor cited in the warrant involves giving false information to a peace officer. [¶] (e) The person arrested is a danger to himself or herself or others due to intoxication or being under the influence of drugs or narcotics. [¶] (f) The person requires medical examination or medical care or was otherwise unable to care for his or her own safety. [¶] (g) The person has other ineligible charges pending against him or her. [¶] (h) There is reasonable likelihood that the offense or offenses

his chambers on May 10, 1990. At the meeting the presiding judge asserted the cite and release program violated section 827.1.

As a result of the meeting, Gates adopted a revised policy which precluded release of those individuals specifically excluded from release under section 827.1. The revised policy was fully in place by the end of July 1990, and the record indicates there have been no releases in violation of section 827.1 since.

Nevertheless, some eight months later, the municipal court initiated contempt proceedings against Gates for citing and releasing 18 people at various times *prior* to the revised policy having gone into effect.[2] The charging counts alleged that Gates "intentionally and willfully" released defendants in criminal cases in "violation of Penal Code Section 827.1."

The hearing on the contempt was presided over by the presiding judge of the Central Orange County Municipal Court. The municipal court was represented by attorneys from a private law firm, while Gates was represented by county counsel.

Gates testified in his own defense. He said he was not aware of the "implications" of section 827.1 until the May 1990 meeting with the presiding judge. The sheriff acknowledged some arrestees may have been released in contravention of section 827.1 prior to July of 1990, but explained that he instituted restrictions on the cite and release program after the May 1990 meeting to prevent such releases. He also testified that, faced with the possibility the ACLU might seek to expand the federal class action to all three county facilities, he put a voluntary cap on the number of inmates at the two other locations, so each inmate there would have a bed or a bunk as well.

The day shift watch commander at the intake-release center at the main jail, Eugene Lutito, also testified on behalf of Gates. Lutito had calculated

---

would continue or resume, or that the safety of persons or property would be immediately endangered by the release of the person. [¶] (i) The person refuses to sign the notice to appear. [¶] (j) The person cannot provide satisfactory evidence of personal identification. [¶] (k) The warrant of arrest indicates that the person is not eligible to be released on a citation. [¶] The issuance of a citation under this section shall be undertaken in the manner set forth in Sections 853.6 to 853.8, inclusive."

Section 827.1 only applies to pretrial arrestees. It has no application to persons who are convicted of crimes. (Cf. Pen. Code, § 853.6 [citation in lieu of arrest occurs prior to booking].)

[2]In all but one of the cases, the arrestee failed to appear in court after having been cited and released. Of the eighteen, two were cited and released in July 1990, eight in June 1990, and the remainder prior to that. Nine of the eighteen involved persons arrested on warrants for having furnished false identification to a police officer.

available bedspace on a systemwide basis at the time each of the 18 arrestees was released. In 13 of the 18 cases, there was no bedspace, i.e., Lutito's calculations yielded a negative number. In the five remaining cases, however, Lutito had come up with a number showing at least one available bed existed at the time of release. In none of those five cases, however, was the men's main jail projected to be more than twelve hours away from violating Judge Gray's order that every prisoner have a bed or bunk. Moreover, available bedspace did not necessarily mean the beds were suitable for the kinds of inmates who might be arriving at the jail.

After taking the matter under submission, the presiding judge found the sheriff guilty on all but one of the charges. The judge concluded that Gates could have complied with *both* Judge Gray's order and section 827.1, for two reasons: One, the sheriff might have sent the released arrestees to either of the two remaining facilities, where there was only a *voluntary cap* on inmate population. Two, the fact the sheriff was able to implement a cite and release program after July 1990 without violating section 827.1 proved he had the ability to do so all along. Also, it made no difference that neither Sheriff Gates nor his lieutenants knew of the limitations of section 827.1 prior to the May 1990 meeting. They were aware of the court orders "remanding the various criminal defendants" into the sheriff's custody.

The presiding judge rejected the idea Gates had purged himself of any contempt by revising the cite and release program. To the presiding judge, this would have undermined the very basis of all contempt laws in California, because Gates would have, in effect, gone unpunished for violating section 827.1. As the judge stylized the purgation argument, it meant excusing Gates because he said, "All right. I was caught. I won't do it again."

In finding Gates in contempt, the presiding judge emphasized some of his broader concerns about the role of the judiciary in the context of the three-fold separation of powers (executive, legislative, judicial) characteristic of government throughout the United States. His thesis was that unless the executive and legislative branches provided adequate jails, the judiciary could be "put out of business." The presiding judge stated he needed "to protect now the ability of the Court to enforce its own orders" and asserted that a court has the "inherent power to coerce other branches to give it the ability to enforce its orders."

Gates was eventually fined $17,000 and sentenced to 30 days in his own jail. Gates then asked the superior court to issue a writ requiring the municipal court to desist from any further efforts to hold him in contempt.

The superior court found there was insufficient evidence of the sheriff's ability to comply with section 827.1 or that he intended to violate any state

law or court orders. A judgment was entered vacating the contempt convictions and prohibiting the municipal court from conducting further proceedings in the matter. The municipal court appealed when a motion for reconsideration was denied.

## II

Normally, it is the local district attorney who prosecutes violations of the Penal Code. In this case, however, the charging document which initiated the contempt action—an order to show cause re contempt—was signed by the presiding judge of the municipal court. Accordingly, we note the obvious. In holding Sheriff Gates in contempt, the presiding judge of the municipal court acted as both litigant and judge in the same case.

■ Of course, there will be times when a judge, in effect, acts as a prosecutor—when a contempt occurs in his or her immediate presence. This is known as "direct" contempt, and implicates the ability of the judge to control the courtroom and its proceedings. If a contempt is direct, the judge presiding has the constitutional power to punish the contempt summarily. (*Turkington* v. *Municipal Court* (1948) 85 Cal.App.2d 631, 635 [193 P.2d 795].)

Indirect contempt is a different matter. It takes place outside the presence of the judge. Absent some emergency, the affronted judge who prefers the charges should not sit in the contempt proceedings. (*Turkington* v. *Municipal Court, supra*, 85 Cal.App.2d at p. 636.)

■ Here, the contempt proceedings brought against Gates were unquestionably indirect. The sheriff did nothing in the presence of a court to warrant any sort of censure. His alleged misconduct was a matter concerning his administration of the county jail system, something entirely outside of the immediate presence of the municipal court. Under such circumstances, there is no question that the presiding judge should have disqualified himself. (See *Turkington* v. *Municipal Court, supra*, 85 Cal.App.2d at p. 637.) It is elementary that a party should not act as judge in his or her own case.

Gates has not raised this point to any of the courts—including this one—before whom he has appeared. Such is the insidious nature of one person acting both as prosecutor and judge, however, that we do not know whether this omission is accidental or deliberate. One must tread carefully when one's opponent is in control of proceedings which might land one in jail. Perhaps Gates's counsel, assessing the possibility the case might be reversed and eventually returned to the presiding judge, made a judgment call not to risk his adversary's disfavor. We do not know.

Nevertheless, whatever the reason for Gates not having raised the issue, the fact remains it has not been briefed. Assuming that Gates made the deliberate decision to waive the issue, it would be counterproductive to request him to address it in supplemental briefing. Accordingly, we move on to the points that have been briefed. (Cf. Gov. Code, § 68081.)

III

A

In finding the sheriff guilty of contempt, the presiding judge of the municipal court delivered a civics lesson about the separation of powers. He should have discussed federalism.

The single overriding fact here is Judge Grays's federal court order. It romps through this case like the proverbial 800-pound gorilla. Neither the presiding judge of the municipal court, nor we, nor even the California Supreme Court has any legal authority to affect that order. (*Ableman* v. *Booth* (1859) 62 U.S. 506 [16 L.Ed 169].)[3] One may applaud the order; one may deplore it. It makes no difference. The sheriff had no choice but to obey it.[4]

---

[3] In *Ableman* a state supreme court ordered the release of a federal prisoner arrested for violating federal law. The United States Supreme Court struck down the order, holding the state court had no lawful authority to release the prisoner, and declaring the state supreme court action threatened "the very foundations" of the government of the United States. (62 U.S. at p. 525 [16 L.Ed at p. 176].) Most of the opinion is a discourse on the relationship between the states and the federal government, the crux of which is that state governments have voluntarily allowed their sovereignty to be "limited and restricted by the Constitution of the United States." (62 U.S. at p. 516 [16 L.Ed at p. 173].)

Of course, considered retrospectively, the case involves certain ironies: it is a ringing declaration of federal supremacy in the face of conflicting state law written by a southerner, Chief Justice Roger Taney, prior to the Civil War. (The federal law involved was the fugitive slave law, the prisoner had helped a slave escape, and the state was Wisconsin.) Almost 100 years later, the United States again upheld the supremacy of federal over conflicting state law in *Cooper* v. *Aaron* (1958) 358 U.S. 1 [3 L.Ed.2d 5, 78 S.Ct. 1401], the famous Little Rock, Arkansas school desegregation case, in language not wholly dissimilar to Chief Justice Taney's in *Ableman*: "It is, of course, quite true that the responsibility for public education is primarily the concern of the States, but it is equally true that such responsibilities, like all other state activity, must be exercised consistently with federal constitutional requirements as they apply to state action." (358 U.S. at p. 19 [3 L.Ed.2d at p. 17].)

[4] During cross-examination in the contempt proceeding, Gates was asked twice—once by counsel for the municipal court and again by the presiding judge himself—whether any consideration was given to simply allowing the men's main jail to exceed the federally imposed population cap and then letting the county pick up the tab for the ensuing fine. We certainly hope that the municipal court presiding judge and the municipal court's counsel were not seriously suggesting that Gates should have openly violated a federal court order and then forwarded the "bill" to the board of supervisors! Besides being contrary to the need to respect court orders articulated by the municipal court presiding judge himself, the stratagem

To the extent that violating section 827.1 may have been necessary to comply with Judge Gray's federal court order, the supremacy clause of the Constitution of the United States afforded the sheriff immunity from state prosecution. (*Washington* v. *Fishing Vessel Assn.* (1979) 443 U.S. 658, 695 [61 L.Ed.2d 823, 851, 99 S.Ct. 3055] ["State-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution."].)

*Badgley* v. *Santacroce* (2d Cir. 1986) 800 F.2d 33 is directly on point in this regard. There, like here, inmates of a county correctional facility sued the local sheriff and warden to alleviate overcrowding. Eventually, a federal court decree placed a limit on the jail population. During the course of subsequent proceedings in the matter, the sheriff and warden suggested that compliance with the federal court order would possibly place them in violation of a state law which required them to house inmates sent them by state judges and hence subject them to the risk of a state court contempt action. The Second Circuit quickly put the thought to rest: "Even if a state court would hold the defendants in contempt for refusing to house inmates . . . , or if compliance would otherwise violate state law, Supremacy Clause considerations require that the judgment of the federal court be respected. [Citations.] In any attempt by a state court to hold [the sheriff and warden] in contempt for taking actions required by the judgments of the District Court, *that judgment would provide a complete defense.*" (*Id.* at p. 38, italics added.)

Other federal cases have reached similar conclusions. When New York sought to sanction officials of its department of finance for violation of its records-release rules when they produced them pursuant to a federal court subpoena, it was held that the supremacy clause barred imposition of state law sanctions. (*In re Grand Jury Subpoena, May, 1978 at Baltimore* (4th Cir. 1979) 596 F.2d 630; see also *In re Hampers* (1st Cir. 1981) 651 F.2d 19.)[5]

Thus, to the degree that Gates's cite and release program was necessary to implement the federal court order, Gates was immune from prosecution for

---

would not have worked anyway. Eventually the federal court would have responded by increasing the amount of the fines or by throwing someone in jail.

[5]There is a flip side to this coin. The federal courts override state law only as a last resort, when other alternatives are inadequate. For example, in a recent jail overcrowding case out of the Ninth Circuit, *Stone* v. *City and County of San Francisco* (9th Cir. 1992) 968 F.2d 850, the federal trial court had authorized a sheriff to override applicable state laws and criminal sentences to relieve overcrowding. The Ninth Circuit held the trial court "should have waited until the threat of sanctions failed to induce compliance before authorizing the state-law-override provisions." The appellate court pointed out there were no findings "other alternatives were inadequate," which was necessary for an override order. (968 F.2d at p. 864.)

Nevertheless, the Ninth Circuit stated that federal override of state law was still possible: "While we hold the district court went too far under these circumstances in allowing the

failing to enforce conflicting state law by virtue of the supremacy clause. To that degree, enforcement of section 827.1 in the face of the federal court order was legally impossible.

B

The municipal court makes three arguments that Gates could have successfully served two masters, i.e., *both* complied with the federal court order and enforced section 827.1. First, it argues that Gates could have sent inmates to one of the two remaining county facilities, neither of which was under a federally ordered population cap. Second, it points to officer Lutito's testimony showing at least some available bedspace when five of the eighteen arrestees were released. Third, it contends that the very fact that Gates was able to implement a cite and release program after the May 1990 meeting which did not contravene section 827.1 proves that he could have enforced the statute all along.

1

Gates's testimony was clear that he instituted a "voluntary" cap on the population of the two branch jails to ensure that every inmate had a bunk or bed on which to sleep at night. ■ The municipal court's first argument, therefore, reduces to the proposition that Gates should have fostered a condition at the branch jails which the federal court had already found intolerable at the main jail. As such, the argument reduces to absurdity. It erroneously assumes the United States Constitution does not apply to the county's branch jails absent a specific federal court order.

Gates needed no special insight to see what the federal court would do if he did not provide a bed or bunk for all his inmates, regardless of where they were housed. If it was unconstitutional to force inmates in the men's main jail to sleep on the floor, a reasonable person would conclude it was also unconstitutional at the two other facilities, even if a federal court had not yet said so in a formal order.

It is regrettable conditions in the main jail deteriorated to a point of warranting federal intervention. It would be more regrettable if we compounded the problem by holding that Gates should manage branch jails in a way he could not lawfully manage the main jail.

Sheriff to override state laws and state court sentences, we do not rule out the possibility that such action may be necessary in the future." (968 F.2d at p. 864.)

## 2

### a

The municipal court fares better on the impossibility issue with its second and third arguments. ▮ Both Lutito's retroactive calculations and the "success" of the revised cite and release program indeed show that, as contended by the municipal court, it was not *absolutely impossible* for Gates to both comply with the federal court order and enforce section 827.1.[6] However, even if the defense of impossibility does not excuse Gates on these points, the municipal court never proved that Gates acted with the requisite intent to support a contempt conviction.

We begin by noting certain basic principles concerning the law of contempt. ▮ Under California law, contempt proceedings are characterized as "quasi-criminal," with the judgments of conviction governed by rules applicable to criminal cases. (*Turkington* v. *Municipal Court, supra,* 85 Cal.App.2d 631, 635, citing *Hutton* v. *Superior Court* (1905) 147 Cal. 156 [81 P. 409], and *Mattos* v. *Superior Court* (1939) 30 Cal.App.2d 641 [86 P.2d 1056].) For purposes of federal due process rights, however, contempt proceedings are either civil or criminal, depending on the nature of the proceedings and the relief afforded. (See *Hicks* v. *Feiock* (1988) 485 U.S. 624, 631 [99 L.Ed.2d 721, 731, 108 S.Ct. 1423].) If the punishment is remedial, and for the benefit of the complainant, it is civil. (*Ibid.*) The basic idea of civil contempt has been expressed as an attempt to "coerce the contemnor to obey a judicial order," (*Twelve John Does* v. *District of Columbia* (D.C. Cir. 1988) 855 F.2d 874, 878 [272 U.S. App.D.C. 235]) or "compel a reluctant party to do what a court requires of him" (*Tate* v. *Frey* (W.D.Ky. 1987) 673 F.Supp. 880, 883).

Contempt is criminal, on the other hand, if it is to "'vindicate the authority of the court'" and the aim of the punishment is to punish rather than coerce. (See *Hicks* v. *Feiock, supra,* 485 U.S. at p. 631 [99 L.Ed.2d at p. 731], quoting *Gompers* v. *Bucks Stove & Range Co.* (1911) 221 U.S. 418, 441 [55 L.Ed. 797, 806, 31 S.Ct. 492].)[7]

▮ In the present case, the nature of the contempt charges brought against the sheriff, from the point of view of federal due process, was clearly

---

[6]In the face of the federal court order, limited facilities, and an expanding inmate population, Gates was forced to practice a kind of triage: making priority decisions as to who should go and who should stay. The municipal court's position is, in essence, that in making those decisions, he ran afoul of the priorities set out in section 827.1 by the Legislature.

[7]For a more extensive discussion of the nature of contempt in California in the face of the federal model, see both Justice Wallin's majority, and Justice Sonenshine's concurring and dissenting, opinions in *In re Feiock* (1989) 215 Cal.App.3d 141 [263 Cal.Rptr. 437] [same as *Hicks* v. *Feiock* on remand from the United States Supreme Court].

criminal.[8] Gates had already revised his cite and release policies to accommodate section 827.1 more than eight months prior to being charged with contempt, and none of the counts involved arrestees released after July 1990. Moreover, the vindicatory, punitive nature of the proceedings was shown in the comments of the presiding judge when he specifically rejected Gates's purgation argument. The presiding judge reasoned that Gates should be punished lest the promise, "I won't do it again," excuse past wrongful conduct.

Thus regardless of whether we approach this case under the traditional California, or federal, standards, we must view it as criminal in nature, with Gates being entitled to all of the protections the law typically affords criminal defendants.

*b*

In seeking to hold the sheriff in contempt, the statutory authority relied on by the municipal court is section 1209 of the Code of Civil Procedure, subdivision (a)(3): "The following . . . omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: . . . [¶] Misbehavior in office, or other *willful neglect or violation of duty* by a[] . . . sheriff . . . appointed or elected to perform a judicial or ministerial service . . . ." (Italics added.) Accordingly, before the municipal court could hold Gates in contempt under section 1209, it must have had proof beyond a reasonable doubt that Gates willfully neglected a judicial or ministerial duty.

 There is no evidence, however, that Gates ever *willfully* released arrestees in contravention of section 827.1. The worst that may be said is that it took the sheriff two months after the May 1990 meeting to implement the revisions, allowing about ten arrestees to be released who otherwise would not have been set free. Even then, however, there was no specific court order to *immediately* stop any releases in contravention of section 827.1, and no evidence of willful intent to evade the section.

The municipal court argues that regardless of whether Gates intended to violate section 827.1, he still intentionally committed acts that caused releases in violation of section 827.1. To quote from its brief, it cites *Oil Workers Intl. Union* v. *Superior Court* (1951) 103 Cal.App.2d 512, 534 [230

---

[8]*In re Feiock, supra,* 215 Cal.App.3d at page 145, footnote 6, notes the practical problem of characterizing contempts as civil or criminal prior to judgment and the attendant difficulty of varying the due process protection afforded the defendant depending on the characterization. (See also Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1992) ¶ 18.11.5, p. 18-12.)

P.2d 71], for the idea that "[w]ith regard to the 'intent' element of a contempt charge, however, it is sufficient that the contemnor commit an act or fail to perform an act that is required by a valid court order."[9]

The municipal court's argument confuses acts which are contrary to specific court orders, done at a time when the actor has knowledge of those court orders, with the inadvertent violation of one of the myriad statutes which are set out in the various California codes. The confusion appears to stem from the fact that the arrestees were initially detained pursuant to arrest warrants issued by the various judges of the municipal court. While these warrants may have constituted "orders" of the court, Gates was never charged with simply failing to execute arrest warrants. Rather, the violation of section 827.1 was central to the contempts charged.

There never was any *court order* that Gates incorporate the provisions of section 827.1 into his cite and release program. No court ever told Gates, in effect, "In developing a cite and release program, under no circumstances should any arrestee be released who is not eligible under section 827.1." (The May 1990 meeting cannot be considered a court "order.") Cases indicating that it is sufficient simply to show acts in violation of a specific court order to establish contempt therefore do not require a finding of contempt here.

The other authorities cited by the municipal court (*Clear Lake Water Co.* v. *Superior Court* (1939) 33 Cal.App.2d 710, 716 [92 P.2d 921]; *City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 518 [241 P.2d 243]; *McFarland* v. *Superior Court* (1924) 194 Cal. 407, 422-423 [228 P. 1033]; *In re Karpf* (1970) 10 Cal.App.3d 355, 372 [88 Cal.Rptr. 895]) are likewise unavailing. In each one of these cases, the contemnor acted knowing of a specific court order prohibiting the actions taken. Here, by contrast, there was no court order forbidding release in violation of section 827.1, nor, for that matter, knowledge of section 827.1. This is a far cry from *willful* neglect of duty.[10]

---

[9]That is not quite what *Oil Workers* said. The actual language from *Oil Workers* shows that the requisite intent is established if the defendant "committed an act proscribed by a lawful order of a court and did so with knowledge of that order and its pertinent provisions . . . ." (103 Cal.App.2d at p. 534.) Somehow the idea of the contemnor's knowledge of the order was omitted from the municipal court's formulation in its opening brief. To be fair, the idea pops back up again in the municipal court's discussion of *Oil Workers* in its reply brief.

[10]There is a small class of contempt cases where good faith or lack of it bears directly on whether a contempt occurred in the first place. Such cases involve situations where someone acts, not contrary to a specific order of which he or she has knowledge, but of some rule of

## IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

Obviously, in a large urban area such as Orange County, decisions on whom to release must be made by numerous different jail officials after balancing many considerations on a week-to-week or day-to-day and some-times hour-to-hour basis. Gates has wryly observed that he is not running a three-bed jail in "Mayberry." He is responsible for the operation of several county jails housing approximately 4,400 inmates in a manner which balances the dictates of the state and federal Constitutions and statutes with the competing demands of over 100 county judges.[11]

The County of Orange is responsible for incarcerating individuals involved in the judicial systems of five municipal courts and the superior court. For one municipal court to insist on priority jailing for its prisoners must, of necessity, act as a limitation on the other four municipal courts' ability to function. We hope the presiding judge of the Orange County Superior Court will take a leadership role in consulting with all of the county municipal courts and sheriff in dealing with a problem which will only become more complicated in coming years. In an era of shrinking funds for public facilities, additional jail capacity to meet the needs of Orange County may be realized only in the distant future.

■ Trying to resolve complex management problems and the inevitable conflicts which result between public agencies by criminal contempt proceedings has long been frowned upon. Contempt is a remedy which "[s]hould rarely, if ever, be used for the purpose of settling differences of opinion between . . . officials . . . ." (*Uhler* v. *Superior Court* (1953) 117

---

which he or she is unaware. In both *In re Carvallo* (1973) 29 Cal.App.3d 983 [105 Cal.Rptr. 925] and *In re Jasper* (1973) 30 Cal.App.3d 985 [106 Cal.Rptr. 925], alleged contemnors were found to have brought knives into a courtroom, though in each case there was no evidence of intent to use the knife as a weapon. In each case the appellate court held that no contempt could be established given the absence of intent to use the knife improperly, even though there was no doubt each defendant had actually brought a knife into the courtroom. (See 29 Cal.App.3d at p. 987; 30 Cal.App.3d at p. 989.)

Gates's situation is far closer to those of the defendants in *Carvallo* and *Jasper* than to those in *Clear Lake Water Co., City of Vernon, McFarland*, and *Karph*. Unlike Arthur Carvallo, Cora Jasper, and Sheriff Gates, the defendants in the latter cases had knowledge of specific court orders made prior to the actions that got them in trouble.

*See footnote, *ante*, page 45.

[11]His task, however, has been made somewhat easier by the presiding judge of the Orange County Superior Court, who has continually cooperated with the sheriff and issued appropriate orders authorizing release of prisoners when necessary.

Cal.App.2d 147, 156 [255 P.2d 29].) Attempts to resolve conflicts between governmental bodies by litigation must necessarily be disfavored. Not only are the taxpayers incurring the cost of attorneys on *both sides* of this controversy, the matter has now consumed the scarce judicial resources of three separate courts. This is, from the viewpoint of judicial management, not the way to run the store.

There is no proof in this record that Gates ever intentionally violated any court order or willfully neglected any duty. The superior court did not err in granting the requested writ. Its judgment is affirmed.

Moore, J., and Wallin, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 19, 1992.