Filed 6/27/23  P. v. Norwood CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL NORWOOD,<br><br>    Defendant and Appellant. | C092491<br><br>(Super. Ct. No. 19FE010262) |

This case arises out of a domestic altercation.  A jury found defendant Michael Norwood guilty of battery against a person with whom he had a dating relationship (Pen. Code, § 243, subd. (e)(1)),[1] two counts of vandalism (§ 594, subd. (a), one felony and one misdemeanor), carrying a loaded firearm in a public place (§ 25850, subd. (a)), and

---

[1]  Undesignated statutory references are to the Penal Code.

brandishing a firearm (§ 417, subd. (a)).[2]  The trial court suspended imposition of sentence and placed defendant on probation for five years with various terms and conditions, including the condition that he serve 180 days in county jail.  This timely appeal followed.[3]

Defendant, proceeding as a self-represented litigant, argues that the judgment must be reversed for various reasons, among which include insufficiency of the evidence and the trial court's failure to conduct an inquiry to determine whether a juror should have been discharged due to bias.  We disagree and affirm.

## FACTUAL BACKGROUND

*The Prosecution's Case*

From June 2017 to June 2019, defendant and L.D. were in a sexual relationship; they spent time together on a weekly basis at L.D.'s apartment in Sacramento.

On the evening of June 8, 2019, defendant and L.D. argued telephonically after she was unable to pick him up as planned because he gave her the wrong address.  During the argument, defendant was slurring his words.  L.D. became angry and called defendant a "bitch," hanging up on him.

Several hours later, around midnight, defendant was dropped off at L.D.'s apartment.  He smelled of liquor and was carrying a bottle of Hennessy, a beer, and a backpack.

---

[2]  The jury found defendant not guilty of the following offenses: corporal injury upon a person with whom defendant had a dating relationship (§ 273.5, subd. (a)), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), assault (§ 240), and two counts of assault with a firearm (§ 245, subd. (a)(2)).

[3]  After numerous requests to continue the briefing schedule and augment the record, all by defendant, the case was fully briefed on March 16, 2023, and assigned to this panel on March 30, 2023.

Shortly after defendant entered L.D.'s apartment, he confronted her about calling him a "bitch." He got into L.D.'s face, pushed up against her body, and yelled at her. When L.D. put her hand up between them, defendant slapped it away several times and became agitated. After the third slap, defendant grabbed L.D. by the neck and strangled her for approximately five to six seconds.[4] L.D. described the pressure on her neck as a seven or eight on a scale of 10.

After defendant let go of L.D., he prevented her from calling 911 and attempted to take her cell phone. Defendant followed L.D. to her bedroom and "bear hug[ged]" her from behind as she was dialing 911. When he was unable to take L.D.'s phone away from her, he yelled and swore at L.D. and then strangled her again for approximately five to six seconds using the same pressure as before. Thereafter, defendant called L.D. a "bitch" and a "whore" as he paced around the apartment. He also punched five holes in L.D.'s bedroom door and told her that he could have punched her face instead. As defendant was pacing around the apartment, L.D. heard him "messing" with her keys, which included the key to her car. Meanwhile, L.D. sent her aunt a text message asking her to come to the apartment.

Defendant continued to yell and pace around the apartment until L.D.'s mother and aunt arrived. Defendant, who was very upset and angry, refused to leave when the aunt asked him to do so. Instead, he pulled out a small, silver handgun, "cocked it back," and pointed it at or in the direction of the three women.[5] After a brief verbal exchange

---

[4] L.D. used the term "choke" rather than the term "strangle." Although these terms are commonly used interchangeably and both refer to a restriction of air, they are not the same thing. Because it is inaccurate to say that someone was "choked" by another person, we use the term "strangled" in this opinion.

[5] At trial, there was conflicting evidence as to whether defendant pointed the gun at the three women. The aunt testified that defendant did so. When L.D.'s mother testified, she said that the gun "wasn't specifically" pointed at her "directly," and acknowledged that,

3

with L.D.'s aunt, defendant left the apartment with L.D.'s car key. During that exchange, defendant was very upset, yelling and swearing in an "angry fashion," and flailing his arms around.

The aunt called 911. The call, which was recorded and played for the jury, was placed at 2:32 a.m. on June 9, 2019. During the call, she stated that defendant had "pulled a gun on us" and then "cocked it back." The aunt also indicated that defendant had injured L.D., explaining that L.D. had been strangled and had minor cuts and bruises and a knot on her left eye. At trial, there was evidence that L.D. had scratches on her face and neck, swelling around one of her eyes, a cut on her finger, and an injury to one of her toes.

Following the 911 call, the three women drove to the parking lot of a nearby restaurant and waited for the police. When L.D. returned to her apartment complex after speaking with the responding officers, she saw that the hood and driver's side door of her car had been significantly damaged. An eyewitness who lived in a house next to the apartment complex (J.M.) spoke to an officer about the damage to L.D.'s car. After viewing a photographic lineup, J.M. identified defendant as the perpetrator, although he indicated that he was not sure.

At trial, J.M. did not identify defendant as the perpetrator, although he correctly recalled the image he had selected from the photographic lineup.[6] He explained that the

_____

on the night of the altercation, she told a police officer that she did not believe defendant was intentionally pointing the gun at her. However, she later clarified that defendant had pointed the gun at her and "cocked" it when he was less than two feet away from her. For her part, L.D. testified that defendant was holding the gun at his side with the barrel pointing down. However, L.D. told a police officer on the night of the altercation that defendant was pointing the gun at all three women. But five days later, L.D. told a detective that defendant did not point a gun at her.

[6] When asked, J.M. explained that he did not want to testify and was only doing so because he was under subpoena.

person he selected (defendant) "looked like" the person who damaged L.D.'s car, but noted that he "never really talked to the person a whole lot" and was "really mixed up" on the night of the altercation. J.M. explained that he saw an African-American male with dreads,[7] who he had previously seen "coming and going" from L.D.'s apartment "a couple times," damage a car that was parked at the apartment complex. J.M. further explained that he made this observation after he heard "a lot of fighting" and went outside his residence to see what was going on. He noted that the situation was "a little odd" because he heard a female crying and a man "being really loud and cursing a lot." From his porch, J.M. saw a man and three women leaving L.D.'s apartment. After the three women returned to L.D.'s apartment, the man jumped on the hood of a car and kicked the car. When J.M. told the man to stop, the man threatened J.M., saying that he knew where J.M. lived. At trial, J.M. explained that the vandal was the man he "usually" saw with L.D., and that this man was the only man J.M. had seen "coming and going" from L.D's apartment during the year or so she lived at the complex.

Several days later, defendant was arrested at a public park in the City of Sacramento. A search of his backpack revealed a loaded, silver and black .25 caliber semi-automatic handgun that was registered to him.

*The Defense Case*

Defendant testified on his own behalf at trial and was the only defense witness. He described his two-year relationship with L.D. as "friends with benefits." As for the altercation, defendant explained that L.D. was mad when he arrived at her apartment. He further explained that, when he attempted to give L.D. a kiss, she called him a "bum, ass,

---

**7** Defendant is African-American and had shoulder-length dreads in June 2019. At trial, J.M. said that he told the responding officers that the perpetrator was wearing a red T-shirt. However, the officer who conducted the photographic lineup testified that the J.M. did not provide a description of what the perpetrator was wearing. During the 911 call, aunt said that defendant was wearing a black T-shirt.

nigga," and told him not to touch her. When he subsequently attempted to give L.D. a hug, she grabbed a knife from the kitchen and said, "[M]otherfucker, bitch, ass, nigga, don't touch me."[8] Thereafter, L.D. "rant[ed] and rav[ed]" about defendant giving her the wrong address earlier in the evening and then pushed defendant three times while holding the knife. On the third push, one of L.D.'s fingernails hit defendant's face. In response, defendant punched L.D.'s bedroom door numerous times, which caused L.D. to fall down, cry, and scream at him. When asked, he denied that he pushed L.D. or strangled her. He also denied that he tried to "bear hug" L.D. or take her cell phone.

Upon questioning, defendant explained that he was about to leave L.D.'s apartment when her aunt and mother arrived. After a brief confrontation during which it "appeared" that L.D.'s mother had "a weapon on her" (possibly a knife), he left the apartment and walked toward a light rail station. When asked, defendant denied that he pulled out a gun at L.D's apartment or jumped on her car. But he testified that he was embarrassed about the way in which L.D. had spoken to him over the phone earlier in the evening, including her calling him a "bitch ass." Defendant also admitted he took L.D.'s car key, and he had a handgun in his backpack on the night of the altercation with L.D. and when he was arrested at a park several days later.

*The Prosecution's Rebuttal Case*

In rebuttal, the prosecution called the detective who interviewed defendant after he was arrested. During the recorded interview, which was played for the jury, defendant claimed that, on the night of the altercation, L.D. was throwing "stuff" at him, hitting him, and walking around her apartment with a knife telling him to "get the fuck out." Defendant also claimed that L.D.'s mother was armed with a knife.

---

[8] On cross-examination, L.D. denied that she "grab[bed] a knife from the kitchen" during the altercation with defendant.

When asked, defendant admitted that he was upset, "very pissed," and acting "out of character" on the night of the altercation with L.D., including punching L.D.'s door. He explained that L.D. had embarrassed him by speaking to him over the phone in a disrespectful way, which was overheard by a person who was his business "connection." However, defendant denied that he had touched L.D., pulled out a gun at her apartment, or jumped on the hood of her car.

## DISCUSSION

### I

### *Appellate Rules of Procedure*

The California Rules of Court prescribe basic rules for the format and content of appellate briefs. Of relevance here, that rule provides that each appellate brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority; and [¶] . . . [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(B), (C).)[9] An appellant's opening brief must also "[p]rovide a summary of the significant facts limited to matters in the record." (Rule 8.204(a)(2)(C).)

"Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573; see also *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) " 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Desta*, at p. 609; *Denham*, at p. 564.)

---

[9] Further rule references are to the California Rules of Court.

"Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.)  " '[O]ne cannot simply say the court erred, and leave it up to the appellate court to figure out why.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237.)  An appellant has the burden to establish error "by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655; see *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["an appellant is required to not only cite to valid legal authority, but also explain how it applies in his case"].)  It is not an appellate court's responsibility to develop an appellant's arguments. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11.)

Appellate courts may, and ordinarily do, "disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287; see also *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand*).)  Appellate courts also disregard arguments that are not identified by an appropriate heading.  (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].)

It is well established that a reviewing court will ordinarily not consider arguments made for the first time on appeal.  (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 830.)  A party who fails to raise an argument in the trial court has therefore forfeited his right to do so on appeal.  (*People v. Catlin* (2001) 26 Cal.4th 81, 122-123; *Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1228, 1038.)

8

Although defendant was represented by counsel in the trial court, he has chosen to represent himself on appeal. We treat self-represented litigants like any other party and, therefore, they are subject to the same rules of appellate procedure as parties represented by an attorney. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246-1247 [appellant representing self on appeal must follow correct rules of procedure]; see *Burnete v. La Casa Dana Apartments* (2007) 148 Cal.App.4th 1262, 1267 [a self-represented litigant is " ' "held to the same restrictive rules of procedure as an attorney" ' "].)

At the outset, we note that defendant's opening brief violates a number of the California Rules of Court, including the failure to summarize the significant facts, provide proper headings for legal arguments, and present legal analysis and supporting authority for each point asserted, with appropriate citations to the appellate record. (Rule 8.204(a)(1)(B), (a)(2)(C).) While defendant's opening brief includes citations to authority articulating general principles of law, it fails to present reasoned legal argument applying those principles to the facts of this case. It merely recites conclusory contentions of error unsupported by adequate legal and factual analysis explaining how and why the trial court erred. Defendant's undeveloped arguments, which fail to apply the relevant law in any meaningful way, amount to little more than the trial court was wrong and reversal is required. Defendant did not file a reply brief.

Given the deficiencies in defendant's opening brief and his failure to raise arguments in the trial court, we deem his claims of error forfeited. To the extent we exercise our discretion to consider the merits of his claims, we find no basis for reversal, as we next explain.

II

*Sufficiency of the Evidence*

Defendant raises several insufficiency of the evidence claims on appeal. We first conclude defendant has forfeited these claims by failing to set forth all relevant material evidence in the light most favorable to the prosecution. (See *People v. Battle* (2011) 198

9

Cal.App.4th 50, 62; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) But even were we to overlook forfeiture, defendant's claims fail on the merits.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

Under the substantial evidence standard, " '[w]e do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "[A] reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see *People v. Maury* (2003) 30 Cal.4th 342, 403 ["Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].) If the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Jennings* (2010) 50 Cal.4th 616, 639.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient

substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"[T]o prevail on a sufficiency of the evidence argument, the defendant must present his case to us consistently with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*People v. Sanghera*, *supra*, 139 Cal.App.4th at p. 1574.)

As noted *ante*, defendant has not presented his insufficiency of the evidence arguments in a manner consistent with the substantial evidence standard of review. As such, he has not carried his burden to show reversible error. In any event, we have independently reviewed the record and are convinced that sufficient evidence supports the jury's verdict as to each of the convictions challenged on appeal.

B. *Felony Vandalism*

Defendant initially claims insufficient evidence supports his felony vandalism conviction, which was based on the damage to L.D.'s car. Defendant insists reversal is required because there was conflicting evidence as to whether he was the perpetrator. In support of his position, defendant notes that he denied that he was the person who damaged L.D.'s car, and argues that J.M. was unable to adequately identify him as the person who did so.

1. *Applicable Legal Principles*

A person is guilty of the crime of vandalism if he maliciously damages personal property not his own. (*People v. Carrasco* (2012) 209 Cal.App.4th 715, 719, abrogated on another ground as noted in *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1518;

11

§ 594, subd. (a).) If the damage is $400 or more, the crime is punishable as a felony. (*Carrasco*, at p. 719; § 594, subd. (b).)

The law is clear that the identification of a suspect as the perpetrator of a crime by a single eyewitness is sufficient to sustain a conviction. (*People v. Boyer* (2006) 38 Cal.4th 412, 480; see also *People v. Reed* (2018) 4 Cal.5th 989, 1006.) "[A] testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court." (*Boyer,* at p. 480.) "Indeed, 'an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification' " in his trial testimony. (*Ibid.*; see also *People v. Cuevas* (1995) 12 Cal.4th 252, 265.)

" 'Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilty the evidence of identity must be so weak as to constitute practically no evidence at all.' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) " 'The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony . . . go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directly solely to the attention of the jury in the first instance.' " (*Id.* at p. 522.) The lack of 100 percent certainty and expressions of doubt "do not preclude the existence of sufficient support for the jury's verdict" and apply only to the weight of the testimony. (*Ibid.*)

2. *Analysis*

Viewing the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to support defendant's felony vandalism conviction. As we have described *ante*, the evidence presented at trial showed that, on the night L.D.'s car was damaged, defendant and L.D. argued at length telephonically; several hours later, defendant went to L.D.'s apartment and physically confronted her. He attacked L.D.

12

(including strangling her two separate times), yelled at, threatened, and verbally abused her, punched multiple holes in her bedroom door, and pointed a gun at or in the direction of L.D. and others. He was clearly angry.

The evidence also showed that a man of the same race with the same hairstyle as defendant jumped on and kicked L.D.'s car shortly after defendant left L.D.'s apartment with her car key around 2:30 a.m., causing more than $700 in damage. An eyewitness who had seen defendant with L.D. in the past, identified defendant as the person who "looked like" the perpetrator from a photographic lineup on the night L.D.'s car was damaged. At trial, the witness explained that the perpetrator was the same man he saw leave L.D.'s apartment after he heard the altercation and went outside. He testified the perpetrator was the man he usually saw with L.D., noting that the perpetrator was the only man he had seen coming and going from L.D's apartment during the past year or so. When he told the man to stop jumping on the car, the man threatened him and indicated he knew where the witness lived.

Under these circumstances, a rational jury could have concluded beyond a reasonable doubt that defendant was guilty of vandalizing L.D.'s car. We cannot conclude, on the record before us, that the identification evidence was so weak that it amounted to no evidence at all.

In urging a different result, defendant misapprehends the substantial evidence test, which does not require reversal when there is conflicting evidence. (See *In re Caden C.* (2021) 11 Cal.5th 614, 640 [in reviewing factual determinations for substantial evidence, a reviewing court should not resolve evidentiary conflicts; such determinations should be upheld if supported by substantial evidence, even though substantial evidence to the contrary also exists].) Under the substantial evidence standard, we review the record to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Edwards*, *supra*, 57 Cal.4th at p. 715.) Because that

13

standard was satisfied here, we reject defendant's insufficiency of the evidence argument. The jury's guilty verdict shows that the jurors credited the eyewitness's testimony and disbelieved defendant's. We may not reweigh that credibility finding.

C. *Carrying a Loaded Firearm in Public*

Defendant next claims that insufficient evidence supports his misdemeanor conviction for carrying a loaded firearm in a public place. He argues reversal is required because he was "listed with the Department of Justice . . . as the registered owner" of the handgun found in his backpack.

1. *Applicable Legal Principles*

Under California law, it is a crime for a person to carry a loaded firearm on his or her person while in any public place. (§ 25850, subd. (a).) Subdivision (c) of section 25850 delineates the penalties for this offense, which depend on the circumstances surrounding the offense or offender. (§ 25850, subd. (c).) As relevant here, the offense is a felony if the person is *not* listed with the Department of Justice as the registered owner of the firearm (§ 25850, subd. (c)(6), italics added) and otherwise is a misdemeanor (§ 25850, subd. (c)(7)).

To prove that defendant was guilty of the offense of conviction, the People were required to establish that: (1) defendant carried a loaded firearm on his person; (2) defendant knew that he was carrying a firearm; and (3) at that time, defendant was in a public place. (See CALCRIM No. 2530) A person with a backpack containing a firearm has carried a firearm on his or her person for purposes of section 25850, subdivision (a). (*People v. Wade* (2016) 63 Cal.4th 137, 139-142.)

2. *Analysis*

We conclude there was sufficient evidence to support defendant's conviction for carrying a loaded firearm in a public place. The evidence presented at trial showed that, when defendant was arrested, he was in a public park in the City of Sacramento with a backpack containing a loaded handgun. At trial, defendant conceded that he knew there

14

was a loaded gun in his backpack. The fact that defendant was listed with the Department of Justice as the registered owner of the gun is not a basis for reversal. As we have explained *ante*, this fact was only relevant to the penalty for the offense. The record reflects that defendant was properly charged and convicted of a misdemeanor violation of section 25850, subdivision (a), as there was no evidence demonstrating that he met any of the statutory criteria elevating the offense from a misdemeanor to a felony.[10] (See § 25850, subds. (a), (c).)

### D. *Brandishing a Firearm*

Finally, defendant claims that insufficient evidence supports his conviction for brandishing a firearm, which was based on his drawing or exhibiting a firearm in the presence of L.D.'s mother.[11] He argues that reversal is required because there was conflicting evidence as to whether he drew or exhibited a firearm in a rude, angry, or threatening manner.

### 1. *Applicable Legal Principles*

To prove that a defendant is guilty of brandishing a firearm, the People must establish that: (1) the defendant drew or exhibited a firearm in the presence of someone else; (2) the defendant did so in a rude, angry, or threatening manner; and (3) the defendant did not act in self-defense. (CALCRIM No. 983; see § 417, subd. (a)(2).)

"When the evidence shows the weapon was exhibited in a rude, angry or threatening manner, the offense is complete." (*People v. Mercer* (1980) 113 Cal.App.3d 803, 806; see also *People v. Hall* (2000) 83 Cal.App.4th 1084, 1092, overruled on

---

[10] Indeed, under the facts of this case, had defendant *not* been the registered owner of the loaded gun found in his backpack, he could have been charged with a felony violation of section 25850, subdivision (a). (See § 25850, subd. (c)(6).)

[11] As noted *ante*, defendant was found not guilty of two counts of assault with a firearm. (§ 245, subd. (a)(2).) These charges involved L.D. and her aunt.

another ground in *People v. Correa* (2012) 54 Cal.4th 331, 343-344.)  The defendant need not point the firearm at anyone.  (See *People v. Sanders* (1995) 11 Cal.4th 475, 542; *People v. Booker* (2011) 51 Cal.4th 141, 189.)  And the prosecution need not prove that the defendant intended to harm the victim.  (*Hall*, at p. 1092.)  " '[T]he chief evil to be avoided by criminalizing exhibition of weapons is the potential for further violence.' " (*Ibid.*; see *Booker,* at p. 189 [" 'The thrust of the offense is to deter the public exhibition of weapons in a context of potentially volatile confrontations' "].)

Cases holding the evidence was sufficient to support a brandishing offense include scenarios where the crime was preceded by a quarrel or confrontation between the participants.  (See *People v. Booker, supra*, 51 Cal.4th at pp. 153, 189 [the defendant participated in the argument giving rise to the physical altercation and drew his knife in the context of the confrontation]; *People v. Lee* (1999) 20 Cal.4th 47, 52-53, 61 [the defendant used his gun when he and his wife were arguing and pushing each other]; *People v. Rivera* (2003) 114 Cal.App.4th 872, 875-876, 879 [the defendant pointed a gun at the victim when he attempted to intervene in a fight with a girlfriend,]; *People v. Mercer*, *supra*, 113 Cal.App.3d at p. 806 [when ordered to surrender his firearm, the defendant assumed a "classic gunfighter's stance" and told the officer to come and take it].)

### 2. *Analysis*

We conclude there was sufficient evidence to support defendant's conviction for brandishing a firearm in the presence of L.D.'s mother.  As we have detailed above, the evidence presented at trial showed that, during an altercation at L.D.'s apartment during which defendant physically assaulted and verbally abused L.D., he drew a handgun and pointed it at or in the direction of the three women.  He drew the gun and "cocked it back" while in close proximity to L.D.'s mother after he refused to leave the apartment when he was asked to do so.  There was evidence that, while defendant was holding the gun, he was very upset and angry; he was yelling, swearing, and flailing his arms around.

16

The fact that the jury rejected defendant's claim that he never drew a gun, and his alternative suggestion that he acted in self-defense because it "appeared" the mother was armed,[12] does not mean insufficient evidence supported the guilty verdict. There was conflicting evidence on these issues, including evidence that none of the women had a weapon. The mere existence of conflicting evidence is not a proper basis to reverse a conviction for insufficient evidence. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 640.) It was the exclusive province of the jury to determine the credibility of the witnesses and to resolve the conflicts in the evidence by deciding which evidence to believe. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181; *People v. Maury*, *supra*, 30 Cal.4th at p. 403.) The guilty verdict shows that the jury disbelieved defendant's testimony as to the brandishing offense and credited the testimony of L.D., and her aunt and mother. We may not reweigh that credibility finding.

## III

### *Potential Juror Bias*

Defendant contends reversal is required because the trial court failed to conduct an inquiry to determine if Juror No. 3 should have been discharged due to bias. We see no error.

A. *Additional Background*

L.D.'s mother was the second witness to testify for the prosecution. Following that testimony, Juror No. 3 informed the bailiff that she "possibly recognized" the mother as someone who attended her high school at the same time she did. Juror No. 3 explained

---

[12] In closing argument, defense counsel did not specifically argue that defendant was acting in self-defense when he drew his gun. In urging the jury to return a not guilty verdict on the brandishing offense, counsel argued that defendant did not point a gun at or threaten any of the women. Although counsel suggested that defendant may have been acting in self-defense, he did not explain how defendant's conduct amounted to lawful self-defense under the circumstances of this case.

that her "face was familiar," but that she and the mother were not friends and did not have any mutual friends. Juror No. 3 further explained that she attended high school from 1984 through 1988, and that she believed the mother "passed" by her in the hallway.

Both defense counsel and the prosecutor declined the trial court's offer to explore this issue further--that is, conduct an inquiry as to whether Juror No. 3 was biased against defendant. In deciding not to conduct such an inquiry, the trial court noted that Juror No. 3 only thought the mother went to her high school and was not certain that she did.

B. *Applicable Legal Principles*

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) "An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial." (*Id.* at p. 581.)

A trial court may discharge a sitting juror for good cause if it finds the juror is unable to perform his or her duty to render an impartial and unbiased verdict. (§ 1089; *People v. Cleveland* (2001) 25 Cal.4th 466, 474, 477.) Actual bias renders a juror unable to perform his or her duty and thus subject to discharge. (*People v. Lomax* (2010) 49 Cal.4th 530, 589.) "Actual bias" is defined as " 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.' " (*People v. Nesler, supra,* 16 Cal.4th at p. 581; see also *People v. Ayala* (2000) 24 Cal.4th 243, 271-272.) To warrant discharge, the juror's bias "must appear in the record as a demonstrable reality." (*People v. Holloway* (2004) 33 Cal.4th 96, 125.)

When a court has been put on notice that there may be good cause to discharge a juror, it must conduct a sufficient inquiry to determine the facts. (*People v. Burgener* (1986) 41 Cal.3d 505, 520-521, disapproved of on another ground by *People v. Reyes* (1998) 19 Cal.4th 743, 755-756; *People v. Clark* (2011) 52 Cal.4th 856, 971.) The trial

18

court is afforded broad discretion in deciding whether and how to conduct an inquiry to determine whether a juror should be discharged. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348; *Clark*, at p. 971.) The trial court's failure to investigate any and all new information obtained about a juror during trial does not constitute an abuse of discretion. (*People v. Ray* (1996) 13 Cal.4th 313, 343.) "A hearing is required only where the court possesses information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case." (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1348.)

C. *Analysis*

Initially, we conclude defendant has forfeited his claim of error by failing to object to the trial court's response to the possibility of juror bias and by failing to request a more extensive inquiry or investigation into the matter. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 59.) Further, the claim it is forfeited because it is a conclusory contention unsupported by meaningful legal analysis. (*Keyes v. Bowen, supra,* 189 Cal.App.4th at p. 655; *United Grand, supra,* 36 Cal.App.5th at p. 165, fn. 6.)

Forfeiture aside, we see no abuse of discretion. Juror No. 3 merely indicated that a prosecution witness--who was allegedly a victim as well as a relative of the other alleged victims--may have attended high school at the same time Juror No. 3 did, more than 30 years earlier. Juror No. 3 explained that she and L.D.'s mother were not friends and did not have any mutual friends. On this record, no duty arose on the part of the trial court to conduct a more extensive inquiry or investigation into the matter. (See *People v. Davis* (1995) 10 Cal.4th 463, 548 [no duty to investigate juror bias that is based on mere speculation].) The trial court did not possess any information which, if proven true, constituted "good cause" to doubt Juror No. 3's ability to perform her duty to render an impartial and unbiased verdict. The connection, if any, between Juror No. 3 and L.D.'s mother was not the kind of connection that would necessarily result in bias. And nothing about Juror No. 3's disclosure as to her potential connection to the mother suggested that

19

an inquiry would have shown that Juror No. 3 was actually biased against the defense. Indeed, Juror No. 3 did not indicate that she had *ever* interacted with L.D.'s mother, in high school or otherwise.

IV

*Remaining Contentions*

Defendant raises several additional contentions that we deem forfeited. These undeveloped claims, some of which were not raised in the trial court and/or identified under a separate heading in defendant's opening brief, are unsupported by adequate legal and factual analysis. Defendant claims that the trial court erred in denying his pro se motion for new trial and that his trial counsel was ineffective for failing to file or support that motion. He suggests for the first time on appeal that the testimony at the preliminary hearing was insufficient to hold him to answer for the felony vandalism offense. He contends, without elaboration, that the trial court erred by preventing him from presenting evidence that L.D.'s former boyfriend had vandalized her property, and by remanding him into custody based on his failure to appear for his presentence interview with the probation department. He suggests that reversal is required because the police improperly failed to gather and preserve footwear impressions found on the hood of L.D.'s car. We need not and do not consider these undeveloped claims that are presented without reasoned legal argument explaining why reversal is required. Consequently, we disregard these conclusory contentions. (See *United Grand, supra,* 36 Cal.App.5th at p. 165, fn. 6.)

Even were we to overlook forfeiture, defendant has failed to carry his burden to affirmatively show prejudicial error. It is not our role to develop defendant's arguments for him. (*Alvarez v. Jacmar Pacific Pizza Corp., supra,* 100 Cal.App.4th at p. 1206, fn. 11.) In light of our conclusions, no further discussion of the remaining issues raised in defendant's opening brief is necessary.

## DISPOSITION

The judgment is affirmed.

/s/
Duarte, Acting P. J.

We concur:

/s/
Boulware Eurie, J.

/s/
Mesiwala, J.